**D.M. EAGAR, et al., Plaintiffs,**

v.

**SAVANNAH FOODS & INDUSTRIES, INC., et al., Defendants.**

**No. CV 83–P–2492–S.**

United States District Court, N.D. Alabama, S.D.

Aug. 22, 1984.

On Motions for Final Judgment or Interlocutory Appeal Oct. 9, 1984.

Charles Cleveland; Terrill W. Sanders, Birmingham, Ala., for plaintiffs.

Ralph B. Tate; Mark S. Boardman, Stephen E. Brown, James Walker May, M. Christian King, Birmingham, Ala., for defendants.

### Memorandum of Opinion

POINTER, Chief Judge.

This case concerns the complete termination of a defined benefit pension plan.

Plaintiffs, participants in the Jim Dandy Company Retirement Plan for Non-Union Employees (the Plan), seek under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), to recover lump sum payments in satisfaction of their vested and nonforfeitable right to an accrued benefit under the Plan and to recover surplus assets that will remain after payment of all Plan liabilities. The defendants are Savannah Foods & Industries, Inc. (SFI), the Plan sponsor; The Jim Dandy Company, a wholly owned subsidiary of SFI and Plan administrator; Western Grain Company, a wholly owned subsidiary of SFI that assumed Jim Dandy's obligations under the Plan; Chatham Corporation, the successor corporation to Western Grain after Western Grain changed its name; the Jim Dandy Company Retirement Plan for Non-Union Employees; and the Bankers Life Company, the entity described as the trustee in the summary Plan description and the party currently in possession of the Plan assets.

The plaintiffs have moved for partial summary judgment. They argue that they are entitled both to a lump sum payment and to any surplus assets remaining after termination of the Plan. The defendants (except Bankers Life [1]) seek summary judgment on the same two issues, arguing that neither the Plan nor ERISA provides plaintiffs with the right to a lump sum payment and that the Plan expressly provides for reversion of surplus assets to the defendants after payment of all Plan liabilities on termination. On the basis of the undisputed material facts, the court concludes that the defendants are entitled to summary judgment on these issues.

The plaintiffs also contend that they are entitled to recover their pro rata share of the contributions that allegedly should have been made during the portion of 1981 when the Plan was in effect. This contention, however, is mooted by the holding

---

**1.** Bankers Life has interpleaded the Plan assets into court, prayed for an adjudication of its rights and liabilities, and moved for appointment of a trustee ad litem. The court intends to deal with these matters in a separate hearing. Throughout the remainder of this Opinion, reference to "the defendants" includes all defendants except Bankers Life.

that the plaintiffs are not entitled to any surplus Plan assets and the fact there are sufficient assets to provide the plaintiffs with the rights guaranteed to them under the Plan.

The plaintiffs further assert that they are entitled to severance pay upon the termination of their employment, a claim that is being pursued on behalf of the plaintiffs and other former employees in the separate case of *Clarence Cory, et al. v. Savannah Foods, et al.*, Case No. 83–P–2052–S. In the present case, however, plaintiffs contend that they are entitled to service credits for this termination pay in the calculation of their benefits under the Plan. Neither side has addressed this issue in its motion for summary judgment.

Accordingly, a separate order will be entered granting partial summary judgment in favor of the defendants and reserving a decision on plaintiffs' claim to service credits based on disputed termination pay for consideration in conjunction with the *Cory* case.

## FACTUAL BACKGROUND

The undisputed material facts are as follows. Prior to April 20, 1981, SFI operated plants in Birmingham and Decatur through its wholly owned subsidiary, Jim Dandy. Jim Dandy's non-union employees participated in the Plan, which was a defined benefit plan funded predominantly by Jim Dandy and SFI. On April 20, 1981, Jim Dandy sold its Birmingham plant to Western Grain Company, another wholly owned subsidiary of SFI, and SFI then sold its Jim Dandy stock to Willmac, Inc., an unrelated corporation. Western Grain Company assumed all obligations under the Plan with respect to employees at both plants. On June 12, 1981, Western Grain adopted a resolution terminating the Plan effective September 30, 1981. Earnings and service credits ceased on April 19, 1981, for the Decatur participants and on June 15, 1981, for the Birmingham participants. Shortly thereafter, Western Grain changed its name to Chatham Corporation.

During the course of the next year, the defendants submitted information to the Pension Benefit Guaranty Corporation (PBGC) concerning the proposed Plan termination, the proposed distribution of Plan assets, and the proposed method for calculating the proportionate shares due Plan participants. On June 24, 1982, the PBGC issued a Notice of Sufficiency stating that the Plan assets, in the opinion of the PBGC, were sufficient "to discharge when due all obligations of the Plan with respect to guaranteed benefits." Several days later, the defendants gave the plaintiffs notice of the Plan termination, and offered them the option of electing a monthly benefit payable at age 65 under an annuity purchased from The Bankers Life Company or a cash lump sum payment computed on the basis of published PBGC actuarial assumptions for plans terminating on or about September 30, 1981. *See* 29 C.F.R. Part 2619, Appendix B. None of the plaintiffs elected either option, contending that they were entitled to lump sum payments calculated on the basis of actuarial assumptions contained in the Appendix to the Plan. Subsequently, the defendants withdrew their offer to make lump sum payments, and now contend that the plaintiffs are not entitled to any such payment under the Plan.

## PLAINTIFFS' CLAIM TO A LUMP SUM PAYMENT

The plaintiffs base their claim to a lump sum payment on the terms of the Plan, conceding that ERISA entitles them only to a monthly benefit upon reaching normal retirement age. *See Fine v. Semet*, 699 F.2d 1091, 1093 (11th Cir.1983). Section 11.02(a), which governs the distribution of Plan assets, provides that in the event of a Plan termination a participant's right to his "Accrued Benefit" (as defined in Section 1.02) becomes fully vested and nonforfeitable. Section 11.02(a) also provides an order in which the assets of the Plan shall be distributed, and requires that this distribution be based upon the "present value" of a given participant's benefits at the time of distribution. Section 1.02 defines "Accrued Benefit" as the annual retirement income to which a participant becomes entitled

upon reaching normal retirement age, in the form of a single life annuity. Section 8.03 states that "[n]o person shall have any financial interest in, or right to, the Pension Fund or a part thereof, except as expressly provided for in the Plan." Section 9 provides for the administration of the Plan by an administrative committee, and Section 9.08 provides that the committee's good faith interpretation of the Plan shall be final and conclusive. Section 10.02 of the Plan, entitled "Small Payments," provides that the administrative committee "may" direct that a participant's benefit be paid in a lump sum if the Plan benefit payable is $100.00 or less per month. Section 10.02 further provides that those small payment lump sum amounts shall be the "Actuarial Equivalent," as that term is defined in Section 1.06, of the participant's Plan benefit. The Plan appendix contains "Lump Sum Factors" for calculating small payments lump sums pursuant to Section 10.01.

The plaintiffs argue that use of the phrase "present value" in Section 11.02(a) entitles them to a lump sum payment. They reason that, since the present value represents a cash equivalent of a future income stream, use of the phrase "present value" in Section 11.02(a) entitles them to a present cash equivalent of their Accrued Benefits. Section 11.02(a), however, merely states a method for valuation of participants' proportionate benefits; it does not state in what manner or form the Plan is obligated to disperse those benefits. Moreover, it is manifest that the language of Section 11.02(a) requiring payment of "respective proportionate shares based upon the present value" of benefits at the time of payment was intended to apply only in the event that Plan assets should be insufficient to meet all Plan obligations. It provides that the "assets in the Pension Fund [shall be held and applied] *in the following order*, all persons in each class being enti-

tled to their respective proportionate shares based upon the present value of their benefits at the time of application...." (emphasis added). The section then creates five categories for priority of payment. *See* ERISA, § 4044(a), 29 U.S.C. § 1344(a). These payment priorities necessarily become operative only when Plan assets are insufficient to meet all Plan obligations. If the plan has sufficient assets to meet all its obligations, the necessity to consult Section 11.02(a) to determine priorities never arises. Considering Section 11.-02(a) in its entirety, the court therefore concludes that the present value language in question applies only in the event that Plan assets are insufficient to meet all Plan obligations.

Accordingly, since in the present case Plan assets are sufficient to meet the Plan's obligation to provide each of the plaintiffs with a monthly retirement income, the language of Section 11.02(a) is not brought into play and there is no basis for any claim of entitlement to a lump sum payment. The court therefore holds for the defendants on the issue of whether the defendants were obligated under the Plan to offer the plaintiffs a lump sum payment upon Plan termination.[2]

## PLAINTIFFS' CLAIM TO SURPLUS ASSETS

The undisputed material evidence indicates that the Plan assets will exceed the cost of purchasing the necessary single life annuities for all Plan participants. The plaintiffs assert that they are entitled to the surplus assets, relying on the following language in the summary Plan description distributed to all Plan participants:

The Company expects to continue this Plan indefinitely; however, it does have the right to change, amend, or even discontinue the Plan. If the Plan ever does terminate, you have a vested right to

---

**2.** Because plaintiffs are not entitled to a lump sum distribution under the Plan, the court pretermits the issue of whether the defendants would be obligated to calculate present values by using the actuarial assumptions contained in the Plan appendix or the actuarial assumptions published by the PBGC for plans terminating on or about September 30, 1981. *See* 29 C.F.R. Part 2619.

your pension earned to the time of termination of the plan to the extent funded.

In the event that the plan is discontinued, the plan document lists the order in which funds in the plan must be paid out to participants and beneficiaries. The money in the plan cannot be used for any other purpose and cannot revert to the company.

By contrast, Section 11.02(c) of the Plan provides as follows:

Any surplus remaining in the Pension Fund, after the satisfaction of all rights or contingent rights accrued under the Plan with respect to such benefits and after distribution of any released reserves as above provided, shall, subject to the pertinent provisions of federal law or state law, be returnable to the Company.

The plaintiffs assert that the language in the Plan summary either effectively modifies the Plan or estops the defendants from claiming they are entitled to the surplus assets. Alternatively, they argue that the Plan summary contained a fraudulent misrepresentation of a material fact, for which the defendants should be held liable in damages. Plaintiffs base both their contract-related arguments and their fraud arguments on Alabama law and principles of common law.

■ Assuming for the sake of argument that plaintiffs' fraud claims under Alabama law are not preempted by ERISA, nevertheless they have failed to show any detrimental reliance by them on the representations contained in the summary Plan description. Moreover, since the alleged fraudulent representation in the Plan summary concerned a future event, defendants would be liable for fraud only if they made the misrepresentation with an intent to defraud. *Scholz Homes, Inc. v. Hooper*, 287 Ala. 628, 254 So.2d 328 (1971). The material undisputed facts contain no suggestion that the defendants intended to defraud the plaintiffs by any misrepresentations in the summary Plan description.

■ Plaintiffs also contend that the language in the summary Plan description effectively modifies the Plan or estops the defendants from claiming entitlement to surplus Plan assets. In support of this argument, the plaintiffs rely on *Gould v. Continental Coffee Co.*, 304 F.Supp. 1 (S.D.N.Y.1969). For several reasons, however, *Gould* does not support plaintiffs' contention. First, *Gould* was decided before the enactment of ERISA, which brought about fundamental changes in the pension planning area. Second, the plan provision in *Gould* that the plaintiff sought to avoid would have resulted in forfeiture of vested benefits. In the present case, by contrast, it is clear that the plaintiffs will receive their vested benefits in full. Third, the plaintiff in *Gould* had clearly and detrimentally relied on misstatements in the plan summary.

The defendants argue that the language in the Plan summary should be construed to mean only that no Plan assets may revert to the employer until all Plan liabilities and obligations have been met. In support of their argument, the defendants rely primarily on two cases, *In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. 1128 (E.D.Pa. 1977), *aff'd*, 582 F.2d 1273 (3d Cir.1978), and *Washington-Baltimore Newspaper Guild v. Washington Star Co.*, 555 F.Supp. 257 (D.D.C.1983), *aff'd*, 729 F.2d 863 (D.C.Cir.1984). The *Moyer* case involved a challenge to a pension plan amendment. The amendment provided for a reversion of surplus plan assets to the company. The challenge to the amendment was based on a provision in the plan prohibiting any amendment that would permit "trust corpus or income to be diverted to or revert to either of the employers or to be used for any purpose other than the exclusive benefit of the participants or their beneficiaries." 441 F.Supp. at 1131. Despite the language of this plan provision, the court held that the amendment providing for a reversion of surplus Plan assets to the company was permissible. The court based its holding on the conclusion that the phrase "trust corpus or income" was intended by the parties to encompass

only those assets necessary to insure full payments of all Plan obligations and liabilities. The court noted that its holding was reinforced by a scheme of elaborate priorities for distribution of plan assets, which nevertheless failed to include a direction for disposition of surplus plan assets. 441 F.Supp. at 1132.

Likewise, the *Washington Star* court upheld the validity of a plan amendment providing for a return of surplus plan assets to the company, despite a prior plan provision that provided in "no event shall any of the trust fund ... be returned to the Employer or be used for, or diverted to, purposes other than for the exclusive benefit of employees covered by the plan or their beneficiaries." 555 F.Supp. at 258. Relying on *Moyer*, the court stated as follows:

> The Plan document and Trust Agreement, taken as a whole, mandate this result. As a defined benefit plan, the participants, in the absence of an agreement to the contrary, have no right to a windfall resulting from an employer's overly generous contributions to the plan.... As noted above, the Plan document permits reversion. No effort was made to include within that document a method or provision for allocation of any surplus among the various categories of Plan participants. Such an amendment would likely have been appropriate had the parties intended to prohibit reversion.

555 F.Supp. at 261.

 This court finds the rationale behind the holdings in *Moyer* and *Washington Star* persuasive. The Plan in the present case was funded predominantly by employer contributions, and there is no contention that ERISA prohibits the reversion of surplus assets in the present case to the defendants. *See* ERISA, § 4044(d), 29 U.S.C. § 1344(d). Over a period of time, pension plan participants in general stand to benefit more from a policy that encourages employers to fund pension plans generously than from a policy that entitles plan participants to surplus assets and thereby discourages employers from potentially excessive funding. The language in the summary Plan description may reasonably be interpreted as meaning that no assets may revert to the defendants until the Plan has met all liabilities. The interpretation of the summary Plan description is reasonable and comports with the relevant case law and the policies underlying ERISA. This court therefore holds that the defendants are entitled as a matter of law to any surplus assets remaining in the Plan after the Plan has satisfied all its liabilities and obligations.

A separate order shall therefore be entered accordingly granting summary judgment in favor of the defendants holding that plaintiffs are not entitled to lump sum payments or to the surplus funds. The plaintiffs' contentions that they are entitled to service credits for wrongfully withheld termination pay is reserved for decision in conjunction with consideration of the issues in *Clarence Cory, et al. v. Savannah Foods, et al.,* Case No. 83–P–2052–S.

## On Motions For Final Judgment or Interlocutory Appeal

On August 22nd, 1984, the court entered a Memorandum of Opinion and Order holding that the plaintiffs are not entitled to a lump sum payment or any surplus assets remaining upon Plan termination. On September 25, 1984, the court held a conference to consider both the plaintiffs' two motions for an order either directing entry of final judgment pursuant to Fed.R.Civ.P. 54(b) or authorizing an interlocutory appeal and the defendant Bankers Life Company's motion for the appointment of a trustee ad litem. This Memorandum of Opinion and accompanying Order deal with these motions and other matters raised at the conference.

To begin with, the parties stipulated that a portion of the court's August Memorandum of Opinion is in error in stating that the defendants' offer to pay a lump sum computed on the basis of Pension Benefit Guarantee Corporation (PBGC) actuarial factors has been withdrawn. Accordingly, the court's August Memorandum of Opin-

ion is amended to reflect that the defendants' initial offer of a lump sum based on PBGC factors remains open.

■ Second, the parties stipulated at conference that plaintiffs are entitled to appropriate service credits for any severance pay they recover in *Clarence Cory, et al. v. Savannah Foods & Industries, Inc., et al.*, CV 83–P–2052–S. The issue of service credits for termination pay was left open in the court's August Memorandum of Opinion. Accordingly, that Memorandum of Opinion is amended to reflect that, should plaintiffs prevail in the *Cory* case, they will be entitled to appropriate service credits for severance pay.

■ Upon consideration of the motion by Bankers Life to appoint a trustee ad litem, the court concludes that appointment of such a trustee at this time would create unnecessary administrative problems. Accordingly, that motion is denied, subject however, to further reconsideration on motion. Bankers Life, having interpleaded the pension plan assets into court, has also orally moved to be dismissed from this case since there is no evidence of any wrongdoing on its part. The court finds that this motion is well taken, subject however, to the rights of the other parties in this suit to obtain an accounting of the pension plan assets. Therefore, unless cause is shown within thirty days from this date, the court will enter a separate order dismissing Bankers Life.

■ Finally, upon consideration of plaintiffs' two motions for an order either directing entry of final judgment pursuant to Fed.R.Civ.P. 54(b) or certifying an interlocutory appeal, the court concludes that entry of final judgment is appropriate since all issues in the case have been resolved, subject only to distribution of pension benefits. Accordingly, final judgment under Fed.R.Civ.P. 54(b) will be entered, thereby mooting the motion for an order certifying an interlocutory appeal.