**WASHINGTON–BALTIMORE NEWSPAPER GUILD LOCAL 35, affiliated with the Newspaper Guild, AFL–CIO–CLC, et al., Plaintiffs-Plaintiff-Intervenors,**

v.

**The WASHINGTON STAR COMPANY, et al., Defendants.**

**Civ. A. No. 81–1980.**

United States District Court, District of Columbia.

Jan. 17, 1983.

Robert E. Paul, William W. Thompson, II, Eisenberg & Paul, P.C., Arlington, Va., for plaintiff Washington-Baltimore Newspaper Guild, Local 35, et al. and plaintiff-intervenors Washington Mailers Union No. 29.

George B. Driesen, Washington, D.C., for plaintiff-intervenor Columbia Typographical Union No. 101.

James R. Klimaski, Washington, D.C., for plaintiff-intervenor Newspaper & Graphic Communications Union Local 6.

Marvin E. Frankel, James H. Aibel, Washington, D.C., for defendant Washington Star Company, et al.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This litigation calls into play application of provisions of the Employee Retirement Income Security Act 1974 ("ERISA"). 29 U.S.C. §§ 1001 *et seq.* Specifically, the Court must determine who is the lawful claimant to approximately four million dollars of surplus assets in an employee benefit plan terminated in 1981 by The Washington Star Company ("The Star"). The plaintiffs and plaintiff-intervenors who claim the surplus include former Star employees and sev-

eral local unions—the Washington-Baltimore Newspaper Guild, Local 35; the Washington Mailers' Union, No. 29; Local Union No. 26, International Brotherhood of Electrical Workers; Graphic Arts International Union, Local 285; Columbia Typographical Union, No. 101; and Newspaper & Graphic Communications Union, Local 6 ("Guild"). The defendants include The Washington Star Company; Time, Inc., owner of The Star; the Evening Star Employees' Benefit Plan ("Plan"); the Plan's Board of Trustees; and the several individual trustees. Time, Inc. purchased The Star in 1978, prior to the commencement of this litigation.

The plaintiffs seek to enjoin the Star from appropriating the surplus assets. They allege that the defendants' claim violates provisions of ERISA.[1] The parties have filed cross-motions for summary judgment.[2] For the reasons discussed below, the Court determines that after a consideration of the material undisputed facts, the defendants should prevail as a matter of law and the Star is entitled to the surplus assets in the employee benefit plan.

## I.

The background events and material facts in the proceeding are not disputed and may be briefly stated.

The Washington Star Company was for a long time a publisher of an afternoon and early evening newspaper in this City. Starting in 1918, it maintained a pension plan providing retirement and disability benefits for its salaried employees. The pension plan was known as The Evening Star Employees Benefits Plan. Through its entire life it was funded exclusively by contributions from The Star and administered by a committee of trustees appointed by The Star.

Two documents govern its operation: a Plan document describing a definite and fixed level of benefits, and a Trust Agreement executed between the Plan's Trustees and the Star. The operative Trust Agreement was executed in 1945. Amendments to the Agreement, made in 1976 and 1981, give rise to this litigation. Prior to 1976, the Trust Agreement provided that, in the event the company terminated the Plan, "[n]o part of the Trust Fund shall ever revert to the company or inure to its benefit prior to satisfaction of all liabilities to employees under the Plan."

In September 1976, the trustees amended and restated the Plan document and Trust Agreement. The terms of Article XI of the amended 1976 Trust Agreement are central to this dispute. The amended section 1 of the Article included a provision for future amendment of the Trust Agreement:

1. This Trust Agreement *may be amended from time by the Employer, provided that no amendment shall divert the Trust Fund as then constituted, nor any part thereof, to a purpose other than for the exclusive benefit of employees covered by the Plan or their beneficiaries,* and provided further that no amendment shall be adopted if it adversely affects continuing qualification of the Plan under § 401(a) of the IRC, the tax exemption of the Trust under § 501(a) of the IRC, or is in violation of ERISA or any other applicable law (emphasis added).

Any amendment of the Trust Agreement which affects the duties or responsibilities of the Trustees must be agreed to in writing by said Trustees.

Section 2, as amended, governed the trustees' right to terminate the trust:

2. The Trust may be terminated by the employer at any time. *Upon termination, the Trustees shall pay all obligations of the Trust and distribute the balance in the Trust Fund in such manner as they determine will best effectuate the purpose of this Trust and in accordance*

---

1. The Guild also asserts that defendants' claim breaches collective bargaining agreements in violation of the Labor Management Relations Act, 29 U.S.C. § 185, and constitutes a common law tort.

2. The Guild's motion is for partial summary judgment and seeks summary judgment relief on all claims except a claim for punitive damages.

*with ERISA or other applicable law. In no event shall any of the Trust Fund be used to discriminate in favor of officers, shareholders or highly compensated employees or be returned to the Employer or be used for, or diverted to, purposes other than for the exclusive benefit of employees covered by the Plan or their beneficiaries* (emphasis added).

In late July 1981, the Star announced the closing of the newspaper, stating at the same time that the last edition would be published on August 7, 1981. The Star also terminated the Plan and purchased a group annuity contract from the Prudential Insurance Company of America designed to guarantee the payment of all of the Plan's defined benefit obligations. At the same time, the Plan trustees amended Section 2, Article XI of the 1976 Trust Agreement to provide for reversion to the Star of the surplus in the Plan's assets. The amended section 2 provided:

2. The Trust may be terminated by the employer at any time. Upon termination, the Trustees shall pay all obligations of the Trust and distribute the balance in the Trust Fund in the manner provided in the Plan. In no event shall any of the Trust Fund be used to discriminate in favor of officers or highly compensated employees, or be used for, or diverted to, purposes other than for the exclusive benefit of employees covered by the Plan or beneficiaries; *provided that any assets remaining in the Trust Fund after the full satisfaction of all liabilities of the Plan to participants and their beneficiaries shall be returned to the Employer* (emphasis added).

The Guild charges that the Star and the trustees, as Plan fiduciaries, violated their fiduciary responsibilities under ERISA by amending the Trust Agreement. The defendants contend that ERISA permitted such an amendment and that even in the absence of the 1981 amendment the Star was entitled to retain the surplus.

**II.**

ERISA is a broad remedial statute providing special protections for the interests of participants and beneficiaries of employee pension and welfare plans, and imposing uniform standards for administering and preserving the integrity of plan assets.[3] In what is known as the "exclusive benefit" rule, ERISA requires that the fiduciary of a plan discharge his duties solely for the benefit of the plan participants and beneficiaries and that the assets of an employee benefit plan "shall never inure to the benefit of the employer." ERISA §§ 404(a)(1)(A), 403(c)(1), 29 U.S.C. §§ 1104(a)(1)(A), 1103(c)(1). In addition, section 406, 29 U.S.C. § 1106, specifies certain prohibited transactions: subsection (a)(1)(D) bars transfer of any plan assets to a "party-in-interest"; subsection (b)(1) prohibits a fiduciary from "deal[ing] with assets of the plan in his own interest or for his own account"; and subsection (b)(2) bars a fiduciary from dealing in a transaction on behalf of a party whose interests are adverse to those of the plan.

Although plaintiffs contend that those provisions are dispositive,[4] the Star and the trustees rely on a statutory exception to the exclusive benefit rule which, they claim, is applicable here. Section 4044(d)(1) of ERISA, 29 U.S.C. § 1344(d)(1), provides that any residual assets of a defined benefit pension plan funded solely by employer contributions may be distributed to the employer upon plan termination if the following three conditions are met:

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied,

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

The Star and the trustees claim that these requirements for the exception to the

---

3. *See generally, Corley v. Hecht,* 530 F.Supp. 1155 (D.D.C.1982); *Marshall v. Snyder,* 572 F.2d 894 (2d Cir.1978).

4. It is undisputed that Time, Inc. and the Washington Star Company are "parties in interest" as defined in ERISA § 3(14), 29 U.S.C. § 1002(14).

"exclusive benefit" rule are satisfied. The Guild contends, however, that the section 4044(d)(1) requirements are not satisfied because of the prohibition against reversion provided in Section 2, Article XI of the amended 1976 Trust Agreement.

### III.

The principal legal question posed by the cross-motions for summary judgment is whether Article XI of the 1976 Trust Agreement imposed upon the Star and the trustees a fiduciary obligation under ERISA to retain the Plan's surplus for the participants. There are several reasons which lead the Court to the conclusion that it did not and that the defendants, therefore, did not violate ERISA by claiming the surplus.

Except for the 1976 amendments to Article XI, the Star would have a clear claim for the surplus. In addition to section 4044(d)(1), the common law of trusts provides that an employer can retain such a surplus. *See Pollock v. Castrovinci*, 476 F.Supp. 606, 612–13 (S.D.N.Y.1979), *aff'd*, 622 F.2d 575 (2d Cir.1980). Similarly, Internal Revenue Code regulations permit an employer to recover residual assets which result from actuarial error[5] without sacrifice of favorable tax treatment. 26 U.S.C. § 401(a)(2); 26 C.F.R. § 1.401–2(b) (1982). These provisions are clearly intended to ensure that while an employer is obligated to provide defined benefits to plan participants, the participants should not be able to claim a windfall stemming from the employer's accidental overfunding of a defined benefit plan. As one court stated, the "policies underlying the enactment of ERISA" support an employer's claim to a surplus:

> Employers will continue to fund their plan under ERISA guidelines, but will not be penalized for overfunding "in an abundance of caution" or as a result of a miscalculation on the part of an actuary. Thus, employees will continue to be protected to the extent of their specific benefits but will not receive any windfalls due to the employer's mistake in predicting the amount necessary to keep the Plan on a sound financial basis.

*In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. 1128, 1132–33 (E.D.Pa.1977), aff'd, 582 F.2d 1273 (3rd Cir.1978). This general policy disfavoring a windfall is, in fact, embodied in the Plan document itself at section 15.6:

> No participant shall have any rights to, or interest in, any assets of the Fund upon termination of his or her employment or otherwise, except as provided from time to time under this Plan, and then only to the extent of the benefits payable to such participant out of the assets of the Fund.

Nevertheless, the plaintiffs argue that, in this case, the Star irrevocably committed itself in 1976 to disavowal of the recapture right. They rely on the amended 1976 Trust Agreement, section 2, which provides that upon termination, none of the Trust Fund should "be returned to the Employer or be used for, or diverted to, purposes other than for the exclusive benefit of employees covered by the Plan or their beneficiaries."

In response, the defendants offer two arguments. First, that the 1976 amendments, despite the terms, did not prohibit reversion of the surplus assets. In support of this position, the Star and trustees contend that both sections 1 and 2 of Article XI of the 1976 Trust Agreement merely consist of "boilerplate" terminology intended to bring the Trust Agreement into compliance with ERISA's "exclusive benefit" rule. That rule, the Star notes, is designed to protect against diminution or loss of anticipated, defined benefits. Once such benefits are satisfied, as they were in this case, the trustees were free to return residual assets to the employer.

In addition, the Star notes that although section 2, Article XI of the 1976 Trust Agreement may provide support for the Guild's claim, the Plan document has al-

---

**5.** Although the Guild suggested otherwise, it failed to allege or present any facts to the contrary.

ways provided for reversion. Section 12.2 of the Plan document, effective January 1, 1976, states that: "No portion of the fund will revert to a Participating Employer other than . . . such amounts as remain because of erroneous actuarial computations after the satisfaction of all fixed and contingent obligations to such persons." The Star claims that the Plan document governs this issue, citing a number of provisions of ERISA.[6] The Guild, not surprisingly, contests this proposition and, in addition, through the affidavit of an attorney involved in drafting the 1976 amendments, notes that the Plan document was not amended because the Trust Agreement was thought to be controlling.[7]

The Court cannot agree that the 1976 Trust Agreement, by itself, permitted reversion. Section 2 is ambiguous; it is by no means clear whether it was intended to merely incorporate the exclusive benefit rule or whether, in addition, it was intended to address the treatment of a possible Plan surplus. As will be seen below, conflicting affidavits were submitted on this question by participants in the 1976 amendment process.

The Star is entitled to summary judgment, however, on the basis of its second argument—namely, that section 1 of Article XI permitted the 1981 amendment by the Plan's trustees. Under that section, the Star could unilaterally amend the Trust Agreement "from time to time." The only restriction contained in the section is that "no amendment shall divert the Trust Fund . . . to a purpose other than for the exclusive benefit of employees covered by the Plan or their beneficiaries." Such language, unlike the more specific (but nonetheless ambiguous) language of section 2, merely paraphrases ERISA's exclusive ben-

efit rule. Even if one were to accept plaintiffs' argument that section 2 defines "exclusive benefit" so as to prohibit reversion of a surplus, nothing in section 1 mandates reference to section 2 for the definition of "exclusive benefit." As a result, ERISA supplies the definition of this term as used in section 1; as discussed above, section 4044(d)(1) of the Act provides that an employer may retain a plan's surplus without running afoul of the exclusive benefit rule.

The Plan document and Trust Agreement, taken as a whole, mandate this result. As a defined benefit plan, the participants, in the absence of an agreement to the contrary, have no right to a windfall resulting from an employer's overly generous contributions to the plan. Aside from section 2 of Article XI of the 1976 Trust Agreement, the relevant documents detract from the Guild's position. As noted above, the Plan document permits reversion. No effort was made to include within that document a method or provision for allocation of any surplus among the various categories of Plan participants. Such an amendment would likely have been appropriate had the parties intended to prohibit reversion.

The case law also supports this conclusion. The recent ruling in *Pollock v. Castrovinci, supra,* is on point. There, a like plan document contained a provision similar to Article XI of the 1976 Trust Agreement. It provided that:

The employer shall have power to amend the terms of this Plan in any way provided that no such amendment shall enable it to recover or divert from the exclusive benefit of the Participants the fund already deposited in the Trust. Nor shall such amendment alter the rights and benefits as described herein of Retirees as of the date of such amendment.

---

**6.** For instance, section 4044(d)(1)(C), 29 U.S.C. § 1344(d)(1)(C), refers to the need for the statement of an employer's right to recover residual assets in the "plan" document, rather than in a "trust" agreement. Similarly, the fiduciary responsibility provisions of ERISA, which are alleged to have been breached in this case, begin with the establishment of a written "employee benefit plan," rather than a trust. ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

**7.** Aff. of Fernando DiFilippo (March 31, 1981) at § 10. The submission of the affidavit was permitted, over the Star's claim of attorney-client privilege, by Memorandum Opinion and Order of July 16, 1982. The affidavit, however, is of questionable value, see *infra* at 263–264.

*Id.* at 612. Likewise, the employer—as did the Star—amended the above-quoted section before termination of the plan to provide that "any residual assets shall be distributed to the employer." In holding that the amendment did not violate ERISA, the opinion reads: "While the first sentence ..., standing alone, supports plaintiffs' contentions, when it is read in the full context of the plan, which is a defined benefit one, it is apparent that the provision was intended only to prohibit amendments reducing benefits to the extent funded." *Id.* at 617.

Judge Goettel, the trial judge, reviewed the case law on this question and relied in part on *In re C.D. Moyer Co. Trust Fund, supra.* There, a pension plan included the following provision:

> It shall, however, at all times be impossible, if any alteration, amendment or revocation be made pursuant to this provision, for any of the trust corpus or income to be diverted to or revert to either of the employers or to be used for any purpose other than the exclusive benefit of the participants or their beneficiaries.

*Id.* at 1131. Shortly before termination, the employer amended the plan to provide that "any assets which remain in the Plan because of erroneous actuarial computations after the Plan has satisfied all of its liabilities shall be returned to the employer." Judge Goettel noted that section 4044(d)(1) of ERISA provides an explicit exception to the exchange benefit rule. Thus, he held that in the context of a defined benefit plan, the term "trust corpus or income as used in [the section quoted above] means only so much of the funds as were necessary to insure full payment of the plan's obligations to the participants." *Id.* at 1132. The challenged amendment, therefore, simply included the language necessary under section 4044(d)(1)(C) of ERISA.

The Guild cites and relies on two cases which Judge Goettel distinguished. Likewise, this Court finds that they are distinguishable and are not dispositive. In *Kruzynski v. Richard Bros. Punch Co.,* 211 BNA Pens.Rep. D–8 (E.D.Mich. Oct. 13, 1978), the employer had not amended the plan to permit recapture of a surplus and, therefore, the requirements of Section 4044 were not satisfied. As a result, the court held that the surplus belonged to the plan participants. Similarly, in *Audio Fidelity Corp. v. Pension Benefit Guaranty,* 624 F.2d 513 (4th Cir.1980), the trust agreement specifically provided that following termination, "Any funds or other assets held by the trustees or subsequently remitting to the trustees from the Auxiliary Fund shall, after deducting expenses for distribution thereof, be distributed among the participants in an equitable manner." Following termination of the Plan, the employer sought to amend the plan retroactively so as to provide for recapture. This belated attempt was disallowed. The employer could not, under ERISA, retroactively amend the Plan so as to alter the substantive rights of the parties. In addition, the Court distinguished *Moyer* by noting that the *Audio Fidelity* plan, unlike that in *Moyer,* expressly provided for creation of an auxiliary fund for the purpose of purchasing additional annuities at retirement and also expressly provided for distribution of the surplus among the participants upon termination.

Both *Moyer* and *Pollock* provide guidance and are instructive. As in those two rulings, but unlike *Kruzynski* and *Audio Fidelity,* the Star trustees amended the Trust Agreement prior to termination of the Plan. In fact, the Star's position appears stronger than that of the plaintiffs in either *Moyer* or *Pollock* since the Plan document has continuously permitted the reversion.

Thus, the Court concludes, on the basis of the policies behind ERISA, Section 1 of Article XI of the 1976 Trust Agreement, the relevant case law and the Trust Agreement and Plan document taken as a whole, that the Star did not violate ERISA by claiming the Plan's surplus assets upon termination of the Plan in 1981.

## IV.

To buttress its claim to partial summary judgment and its argument that the 1976

amendments prohibited a reversion of the surplus assets, the plaintiffs urge the Court to examine the amendments in the context of "detailed collective bargaining undertakings between the parties over the course of the preceding eight years."[8] While, at the December 13, 1982, oral argument, they conceded that, of their several claims, they had "a more difficult time with this argument" (Transcript at 24), plaintiffs nonetheless rely on several affidavits[9] to contend that the 1976 amendments were triggered by and resulted from oral agreements and understandings between the plaintiff unions and the Star management during collective bargaining negotiations. Thus, the Guild asserts that the later 1981 amendment providing for reversion of surplus assets breached the fiduciary and contractual obligations to the unions as embodied in the oral agreements and understandings.

The factual assertions advanced in the plaintiffs' various affidavits are disputed sharply by the Star.[10] Clearly, there are contested facts on the origin and history of the 1976 amendments sufficient to preclude summary judgment for the Guild. The plaintiffs contend, however, that the issues of fact raised by these affidavits should also preclude the granting of the Star's motion.

There are several reasons why their position is unacceptable. The Guild has failed to point to any written agreement or statement as evidence of its understanding of the significance of the 1976 amendments. The amendments to the Trust Agreement made no mention of any collateral agreement between labor and management. Moreover, and perhaps most important of all, the parol evidence rule effectively restricts and excludes any effort to add additional meaning to the 1976 amendments. *See e.g., Audit Services, Inc. v. Rolfson,* 641 F.2d 757 (9th Cir.1981).

Even if the plaintiffs' affidavits were admissible, they fail to create an issue of fact as to whether the 1976 amendments were intended to prevent reversion of the Plan's surplus. The affidavits contain vague and uncertain references to a prohibition on reversion of assets. They are imprecise in that they fail to specify the identity of the individuals allegedly responsible for reaching such an agreement, its terms and the place and date it was made. By contrast, the Star's affidavits suggest that the 1976 amendments were mere "boilerplate" under ERISA, solely intended to conform the Trust Agreement with ERISA's "exclusive benefit" rule. For instance, Michael Goldman, the attorney primarily responsible for the Plan's design, states that he was never informed that the 1976 amendments were intended to achieve the special purpose now claimed by the Guild. Goldman Aff. (Nov. 29, 1982) at ¶¶ 5–6.

The Guild rests its case largely on the affidavit of former Plan counsel Fernando DiFilippo of March 31, 1982. In paragraph 7, he states:

> As a result of the views expressed [by union representatives] on the issue of no reversion of assets to The Star, one of the proposed changes adopted by the Board of Trustees of the EBF and approved by management of The Star was to provide for this no-reversion feature.

However, in a surprisingly revealing second affidavit submitted on December 17, 1982, DiFilippo disclaims any recollection of an intent behind the 1976 amendments to prohibit reversion of residual assets:

---

**8.** *Reply to Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment* (December 13, 1982) at 5 -6.

**9.** The Guild submitted affidavits of former Plan Counsel Fernando DiFilippo (*see* Note 7, *supra*); former Newspaper Guild Administrative Officer Brian Flores; former Columbia Typographical Union No. 101 Chapel Chairman Lloyd Hysan; and four former officials of the Newspaper and Graphic Communications Union Local 6—president James Dugan, treasurer and negotiator Raphael F. Collins, president

Robert J. Callahan, and president·David Tulloss.

**10.** The Star submitted affidavits of Harold Boyd, the Star's former Director of Industrial Relations; Robert Paffen, the Star's former Director of Employee Relations; Edward N. Duplinsky, the Star's former Director of Personnel; Berl Bernhard, the Star's former general counsel; and Howell E. Begle, Michael F. Goldman, and Zachary Fasman, attorneys who formerly represented the Star.

8. It is now perhaps difficult, at best, to put the "no reversion" provision in proper perspective at the time it was adopted. Although I recall some consideration being given by Mr. Begle that The Star should terminate the Plan and recoup surplus assets, this proposal was simply not viable and, as I recall, it was never seriously considered, if at all, by management of The Star, nor was it ever communicated to me as the policy of The Star by management. Simply stated, there were no surplus assets to recoup nor, based on the Plan's assets at the time and other considerations, could any be expected reasonably in the future. In fact, as I recall, several years after the 1976 amendments, the Plan may have actually incurred a funding deficiency for the purposes of ERISA. *Thus, in my view, whether the Board of Trustees of the Plan and the management of The Star agreed to a "no reversion" provision or not was really an academic issue* (emphasis added).

Although the Guild has asserted throughout this litigation that a no-reversion amendment stemmed from hard-fought collective bargaining, its star witness in a second affidavit severely undercuts that position by asserting that such a provision was an "academic issue." In light of this declaration and the vagueness and imprecision of the plaintiffs other affidavits, the Guild's attempt to place this dispute within the context of collective bargaining negotiations lacks support and must be rejected.

## V.

For the foregoing reasons, the Court determines that the Star's motion for summary judgment should be granted and the complaint dismissed. An appropriate order will be entered.