**Charles RINARD, et al., Plaintiffs,**

v.

**The EASTERN COMPANY, et al., Defendants.**

**No. C–2–89–1062.**

United States District Court, S.D. Ohio, E.D.

Aug. 20, 1991.

Timothy F. Cogan, Patrick S. Cassidy, Wheeling, W.Va., William T. Payne, Pittsburgh, Pa., for plaintiffs.

Richard A. Frye, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio (Juan Jose Perez, of counsel), for defendants.

## OPINION AND ORDER

GRAHAM, District Judge.

The present action was commenced by plaintiffs, former employees of the Pattin Manufacturing Company Division of defendant Eastern Company, on December 28, 1989. The named defendants are the Eastern Company ("Eastern"), the Eastern Company Pension Plan for Hourly–Rated Employees of the Pattin Manufacturing Company Division (the "Plan") and Colonial Bank, a trustee of the Plan and holder of the funds which are the subject of this action. Counts One, Two and Three of the complaint allege violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.

On October 22, 1990, this court granted plaintiffs leave to file a first amended complaint, in which plaintiffs assert the additional claims of estoppel (Count Four), a violation of 29 U.S.C. §§ 1021(d) and 1344(d)(1)(B) under ERISA (Counts Five and Seven), and a violation of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (Count Six). This court also certified this action as a class action except in regard to Count Four and the damage claims for emotional distress asserted in paragraph six of the prayer.

This matter is now before the court on defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment. The procedure for granting summary judgment is found in Fed. R.Civ.P. 56(c), which provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The record before the court reveals that the Plan was terminated following the closing of the Pattin Manufacturing Company plant in Marietta, Ohio. The funding of all of the pension benefits specified in the Plan was completely provided for through the purchase of annuities. Defendants estimate that after the purchase of these annuities, approximately $100,000 remained in the Plan's trust fund. The ultimate question presented by plaintiffs' first amended complaint is whether plaintiffs or defendant Eastern are entitled to these surplus funds.

The distribution of residual assets under ERISA is governed by the provisions of 29 U.S.C. § 1344(d)(1), which provides:

(1) Subject to paragraph (3), any residual assets of a single-employer plan may be distributed to the employer if—

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied,

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

Plaintiffs claim in Count One that the requirements of § 1344(d)(1)(C) have not been met, and that therefore distribution of the surplus to Eastern would violate ERISA. They assert in Count Two that the surplus should be paid to them as benefits. Defendants argue that the Plan does provide for distribution of the surplus to Eastern.

The documents before the court reveal that the pension plan for the hourly rated employees of Pattin Manufacturing dates back to 1957. Section 9 of the original version of the Plan (Toth Dep. Ex. 14) provided that

> any funds not required to satisfy all liabilities of the Plan for pensions because of erroneous actuarial computations shall be returned to the Company.

The Plan was funded by means of a trust agreement which had been in effect since 1952 between Eastern and Hanover Bank. (Defendants' Mot. Ex. 11). Paragraph 11 of the trust agreement provides that

> there may be returned to the Company upon the termination of the Fund, only such amount as may, due to an erroneous actuarial computation, remain in the Fund after the satisfaction of or provision for all liabilities with respect to such employees or their beneficiaries; ...

Section 7 of the original Plan provided that all funds of the Plan would be held by a trustee, and that Eastern would pay contributions to the trustee to fund employee pensions. In Section 8 of the original Plan, Eastern reserved the right to modify the terms of the Plan.

At some point in the 1960's, the United Steelworkers of America became the exclusive bargaining agent for the employees of Pattin Manufacturing.

Following the enactment of ERISA, Andrew Toth, a union representative, worked with Eastern to bring the Plan into compliance with ERISA. During that process, the language in Section 9 referring to reversion of surplus assets to Eastern was dropped from the Plan. Mr. Toth, when questioned about this section during his deposition, could not recall why this change was made. (Toth Dep., pp. 26–28).

In 1975, the 1952 trust agreement was amended to reflect an agreement between Eastern and the Colonial Bank and Trust Company as successor trustee. Section 12.2(d)(i) of the 1975 trust agreement provides in relevant part:

> In the case of the termination of the Plan, and if, but only if, the Plan is a defined benefit plan, any residual assets of the Plan may be distributed to the company at the direction of the administrator (or of a trustee appointed upon the application of the Pension Benefit Guaranty Corporation) if all liabilities of the Plan to participants and their beneficiaries have been satisfied and the distribution does not contravene any provision of law.

The post-ERISA version of the plan, effective January 1, 1976, was changed from time to time. It was not until October of 1978 that section 17.1 of the Plan, relating to Eastern's right to change the Plan terms, was amended to provide that the consent of the union was required for plan modifications. (Defendants' Reply Ex. 5).

Defendants argue that although the Plan itself does not provide for reversion of surplus assets to Eastern, the Plan in effect incorporates the trust agreement by reference. Defendants' position is that the trust agreement should be considered a Plan document. Defendants rely on *Schuck v. Gilmore Steel Corp.*, 784 F.2d 947 (9th Cir.1986). In *Schuck*, the trust agreement provided for a reversion of surplus to the company. The pension agreement authorized the company to establish a trust, but did not specifically identify the trust agreement. The court, *Id.* at 951, rejected the plaintiffs' argument that only the pension agreement should be referred to in analyzing compliance with § 1344(d)(1)(C), and found that the pension agreement incorporated the provisions of the trust agreement concerning reversion and satisfied the requirements of § 1344(d)(1)(C).

Here, the trust agreement authorizes the return of surplus assets to Eastern, where-

as the pension agreement is silent on that point. There is no language in the pension agreement specifically incorporating the terms of the trust agreement. However, there are many references to the trust in the Plan. The terms "trust fund", "trust" and "trustee" are defined in Article 2 of the Plan. "Trust" is defined in Section 2.30 of the Plan as "the legal entity resulting from the Trust Agreement between the Company and the Trustee ...", thereby recognizing the existence of a trust agreement. Under Article 11, Section 11.1 of the Plan, benefits are payable by the trustee directly to the employee. Section 15.9 of the Plan permits Eastern to delegate all or part of its responsibilities in the management, operation and administration of the Plan to the trustee. Under Section 16.1, the trustee, identified in Section 2.31 as the Colonial Bank and Trust Company, is designated a "named fiduciary" with respect to the control, management and disposition of trust assets. Section 16.2 provides for consultation between Eastern and the trustee concerning funding policy and method.

■ Article 18 of the Plan, Section 18.1, states, "In order to implement the Plan, the Company has entered into an agreement of Trust ... for the exclusive benefit of the Members or their Beneficiaries under the Plan who may, in accordance with the terms of the Plan *and such Agreement of Trust*, be entitled to participation thereunder." (Emphasis added) Section 19.5 provides that "It is the intention of the Company that the Plan, and the Trust established to implement the Plan, shall comply with [the Internal Revenue Code and ERISA] and the provisions of the Plan and Trust Agreement shall be construed to effectuate such intention." In light of the many references in the Plan to the trust agreement, including those set forth above, an employee would have ample notice of the existence of the trust agreement and its role in the implementation of the Plan and the payment of benefits.

Additionally, 29 U.S.C. § 1103(a) requires that all assets of an employee benefit plan be held in trust by one or more trustees unless the plan falls within one of the exceptions set forth in 29 U.S.C. § 1103(b), none of which are applicable here. The trust agreement in this case imposes fiduciary responsibilities upon the trustee which should be considered a part of the Plan for purposes of the enforcement provisions of ERISA. In light of the above circumstances, including the fact that Eastern was authorized by the Plan to establish a trust, the trust agreement will be considered a plan document. There is sufficient reference to the trust in the Plan itself to incorporate the trust agreement as a plan document for purposes of ERISA.

■ Plaintiffs point to a variety of factors which they claim indicate an intent on the part of the parties that the trust not be considered a part of the Plan. Plaintiffs note the fact that section 9 of the original Plan which allowed Eastern to claim the surplus was deleted when the Plan was revised following the enactment of ERISA. They assert that Eastern thereby waived any right to recover surplus funds. However, plaintiffs have presented no evidence which would indicate that this change was intentional on the part of Eastern or the union and the employees, nor does this indicate an intent that the trust document, which still contained a reversion provision, be disregarded. The Plan, as amended, contained no provision specifically awarding the surplus to the employees or prohibiting reversion to the employer. Plaintiffs cite no provision in the applicable collective bargaining agreements which would preclude reversion of surplus assets to the employer. The reversion provision in the trust agreement existed at the time of the first collective bargaining agreement, and was in effect at the time the union gained the right to approve plan modifications. The union and employees were well advised by the terms of the Plan that the operation of the Plan was governed in part by the trust agreement. In fact, a notice to employees from the union files containing the dates "November 4, 1977—November 5, 1980" indicated that a "copy of the Plan and related Trust Agreement" was available for inspection and copying. (Reg. Admissions No. 29, Defendants' Reply Ex. 20).

Plaintiffs also argue that if the Plan was modified to comply with ERISA, the deletion of Section 9 from the Plan also had the effect of modifying the trust agreement by striking the reversion clause. This argument ignores the fact that Section 9 of the original plan would not have violated ERISA, but rather would have been permissible under § 1344(d)(1). Therefore, Section 9 could not have been deleted to bring the Plan into compliance with ERISA. Further, there is no evidence that, by removing Section 9 from the Plan, the parties also intended to remove the reversion clause from the trust agreement. In fact, the reversion clause was revised and retained in the 1975 version of the trust agreement. The Plan allowed Eastern to enter into the trust agreement, and the provision in the trust agreement need not be repeated in the Plan itself in order to be enforceable.

Plaintiffs rely on various memoranda by Eastern officials as indicating an intent that the "Plan" be confined to the terms of the Plan Agreement and that the employees would recover the surplus. However, the fact that these letters and memos, which address other matters, do not specifically refer to the trust agreement as being a part of the Plan does not indicate an intent that the trust be excluded from the Plan. These memos certainly indicate no intent that the surplus be distributed to the employees.

Plaintiffs also note that Eastern does not refer to the trust agreement in its filings with the Pension Benefit Guaranty Corporation. However, the forms do indicate the existence of a trust. Other filings by Eastern with the Internal Revenue Service indicate that the trust agreement does not prohibit reversion of surplus assets to the employer. (Defendants' Reply Ex. 9). The Plan summary, p. 19, advises employees that copies of the pension plan "and other Plan documents" are available.

Plaintiffs also refer to the deposition testimony of Mr. Donald Whitmore that he did not recall any employees who had been sent a copy of the trust agreement. Mr. Whitmore indicated that he did not send a copy of the trust agreement in response to requests for information because the trust agreement was referred to in the basic plan document. Plaintiffs have produced no evidence that any request to receive specifically a copy of the trust agreement was not honored by Eastern. In fact, defendants refer to statements by Mr. Toth and other union representatives to the effect that the union had no interest in the trust agreement. There is no evidence that Eastern tried to conceal the trust agreement, or that Eastern did not consider the trust agreement to be relevant to the Plan.

Plaintiffs also argue that incorporation of the trust agreement would be inconsistent with the regulations found in 29 C.F.R. § 2618.1 et seq. However, there is no language in those regulations requiring that the terms of a benefit plan be contained in a single document. Although 29 U.S.C. § 1102(a)(1) requires that an employee benefit plan be established and maintained pursuant to a written instrument, there is no requirement that the written instrument be one all-inclusive document. *Eardman v. Bethlehem Steel Corp. Employee Welfare Benefit Plans*, 607 F.Supp. 196, 207 (W.D.N.Y.1984); *Myron v. Trust Co. Bank Long Term Disability Benefit Plan*, 522 F.Supp. 511 (1981).

In short, the court concludes that there is no material evidence which would indicate that the parties did not intend for the trust agreement to be considered a part of the Plan.

Plaintiffs advance other arguments as to why it would be contrary to ERISA to give effect to the reversion clause in the trust agreement. Plaintiffs rely on *Bryant v. Int'l Fruit Products Co., Inc.*, 793 F.2d 118 (6th Cir.1986), in which the Sixth Circuit held under the circumstances of that case that an amendment to the pension plan which permitted reversion of surplus to the employer was invalid. However, the court in *Bryant* also noted, *Id.* at 123, that each case involving this issue "is controlled by the language of the documents creating the particular plan involved." Where the plan provides for recoupment by the employer, reversion is

permissible. *Int'l Union, United Automobile Aerospace & Agric. Implement Workers v. Dyneer Corp.*, 747 F.2d 335 (6th Cir.1984). In *Bryant*, the plan contained language which specifically prohibited reversion to the employer as well as any amendment of the plan to allow for reversion. No such language is found in the Plan, the trust agreement or the collective bargaining agreement in this case. Further, the trust agreement expressly permitted reversion of surplus assets to Eastern during the entire period the Plan was in effect. Until 1978, Eastern was permitted to unilaterally amend the plan, and the reversion language was in place long before then. The case of *Delgrosso v. Spang & Co.*, 769 F.2d 928 (3d Cir.1985) is likewise distinguishable. In *Delgrosso* the plan specifically prohibited reversion and did not give the employer the right to amend the plan.

Plaintiffs argue that the other clauses in the Plan prohibit recoupment of the surplus by Eastern. Plaintiffs note Section 18.1 of the Plan, which provides that the trust funds shall be "held in trust by the Trustee for the exclusive benefit of the Members or their Beneficiaries under the plan who may, in accordance with the terms of the Plan and such Agreement of Trust, be entitled to participation thereunder." Section 18.2 provides:

> It shall be impossible under any circumstances at any time prior to the satisfaction of all liabilities with respect to Members and their Beneficiaries for any part of the corpus or income of the Trust Fund to be used for or diverted to purposes other than the exclusive benefit of the Members of the Plan and their Beneficiaries and defraying the reasonable expenses of administering the Plan.

The above sections incorporate the language of 29 U.S.C. § 1103(c)(1), which provides:

> Except as provided in paragraph (2), (3), or (4) or subsection (d) of this section, or under sections 1342 and 1344 of this title (relating to termination of insured plans), (or under section 420 of Title 26 as in effect on January 1, 1991) the assets of a

plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying expenses of administering the plan.

■ An exception to this "exclusive benefit" rule is created by § 1344(d)(1), which permits reversion of residual assets to the employer. *Wilson v. Bluefield Supply Co.*, 819 F.2d 457 (4th Cir.1987). A plan provision which merely paraphrases ERISA's "exclusive benefit" rule will not necessarily preclude the application of another plan term which allows for recoupment of surplus by the employer. *Washington–Baltimore Newspaper Guild Local 35 v. Washington Star Co.*, 555 F.Supp. 257 (D.D.C.1983). The "exclusive benefit" rule is designed to protect against diminution or loss of anticipated, defined benefits. *Id.* at 260.

■ Here, the funds were held for the exclusive benefit of the employees insofar as their participation was "in accordance with the terms of the Plan and such Agreement of Trust." Plan, Section 18.1. Section 1.2 of the Plan provides:

> The purpose of the Plan is to provide retirement benefits for the eligible hourly-rated employees of the Company's Pattin Manufacturing Company Division at its Marietta, Ohio plant and their beneficiaries. To provide such benefits, the Company proposes to make the contributions provided for hereunder. Such contributions and any income derived therefrom shall be for the exclusive benefit of Pattin Manufacturing Company Division Marietta, Ohio, employees and their beneficiaries and shall not be used for, or diverted to, any other purpose.

The above language is limited by Section 10.1, which governs contributions by the company. The contributions referred to are those "required to fund the costs of pension and other benefits provided by the Plan" in "such sums as are required, in accordance with sound actuarial practices acceptable to the Internal Revenue Service, to fund the total cost of benefits provided by the Plan for the Members." *Id.* The

Plan also sets forth definite pension and other retirement benefits to which participants are entitled. Thus, reading the Plan as a whole, *see Wilson,* 819 F.2d at 465, the "funds" which are to be held for the exclusive benefit of the participants are those funds necessary for the payment of the pension benefits set forth in the Plan, since the only purpose of the contributions to the fund is to finance the cost of benefits provided by the Plan. Residual assets are assets in excess of those necessary to satisfy defined benefit obligations, and need not be considered a part of the fund for the exclusive benefit of members. *Wilson,* 819 F.2d at 465; *In re C.D. Moyer Company Trust Fund,* 441 F.Supp. 1128 (E.D.Pa. 1977).

Plaintiffs also argue that Section 17.3 of the Plan prohibits reversion. That section provides:

> Upon termination or partial termination of the Plan, the rights of all Employees to benefits accrued to the date of such termination or partial termination to the extent then funded ... shall be nonforfeitable, and upon the occurrence of such event, the assets of the fund shall be allocated among the Members and their Beneficiaries in accordance with Section 4044(a) of ERISA ...

This section reflects the requirements of 29 U.S.C. § 1344(a). However, § 1344(a) does not create any new or independent right to benefits, but simply provides that participants are entitled to accrued benefits only in accordance with the terms of the plan. *Mead Corp. v. B.E. Tilley,* 490 U.S. 714, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989); *Morales v. Pan American Life Ins. Co.,* 914 F.2d 83 (5th Cir.1990). Section 17.3 provides that upon termination, employees are entitled to "benefits accrued." The amount and type of benefits are defined throughout the Plan, and there is no provision to the effect that "benefits accrued" includes residual assets remaining after the liability for the retirement benefits specified in the Plan has been satisfied in accordance with the order of priority established by § 1344(a).

Plaintiffs further assert that the Eastern Plan was a defined contribution plan rather than a defined benefit plan, and that therefore § 1344(d)(1) does not apply. A "defined contribution plan" or "individual account plan" is a pension plan which provides for an individual account for each participant and for benefits based solely on the amount contributed to the participant's account, including any income, expenses, gains, losses or forfeiture which may be allocated to the participant's account. 29 U.S.C. § 1002(34). A "defined benefit plan" is a pension plan other than an individual account plan. 29 U.S.C. § 1002(35). In order for a plan to be a defined contribution plan, the plan must establish a separate account for the participant, and the benefits must be based solely upon the level of funds in that account. *Matter of Defoe Shipbuilding Co.,* 639 F.2d 311 (6th Cir.1981). Where the plan provides for benefits based upon a formula which is independent of the level of funding, it is not a defined contribution plan. *Id.* at 313.

Plaintiffs argue that the Eastern plan is a defined contribution plan because under the collective bargaining agreement, the amount of Eastern's contributions to the fund was established by the formula of a fixed monetary rate times a fixed number of working hours times the average number of employees. However, the use of such a formula does not automatically establish a defined contribution plan. *Defoe Shipbuilding,* 639 F.2d at 313. The amount of benefits in the Plan here was determined by a formula independent of funding, and the Plan did not create individual employee accounts. For example, normal retirement benefits were calculated by multiplying the number of years of participation in the plan times a dollar amount set forth in the plan to arrive at an annual benefit. Plan, Section 3.2. Under Article 10 of the Plan, funding was solely by means of employer contributions, and no employee contributions were required or permitted. Plan, Section 10.3. The Plan in the present case does not satisfy the criteria for a "defined contribution" plan, and is therefore a "defined benefit" plan.

■ Plaintiffs further argue that the amount of contributions made to the Plan was a matter for collective bargaining, and therefore a recovery of surplus could not be unilaterally changed by Eastern. Plaintiffs cite *Professional Admin. Ltd. v. Kopper–Glow Fuel, Inc.,* 819 F.2d 639 (6th Cir.1987), where the court held that plan trustees could not unilaterally increase the amount of contribution required from an employer. In contrast, the present case involves a situation where the employer has agreed to fund certain defined pension benefits through a trust agreement that provides that upon termination of the plan, any surplus beyond the amount required to fully fund those benefits would be returned to the employer.

Here, the Plan and trust agreement were in existence before the first collective bargaining agreement between Eastern and the union. The record reflects that provisions of the Plan were occasionally addressed during labor negotiations and that various amendments to the Plan were agreed upon. Appendix C to the 1974 collective bargaining agreement states that the "Company agrees to continue in effect for its employees, the present Pension program as placed in effect January 1, 1957, and amended November 4, 1975." (Defendants' Reply Ex. 20, Reg. Admissions No. 44). This agreement refers to pension "program," not "plan," suggesting that the union agreed to accept the entire pension scheme then in place, not just the Plan. However, even assuming that the reversion of surplus was never specifically addressed in the collective bargaining process, the evidence shows that the union and employees were advised of the existence and significance of the trust agreement, and could have negotiated for a specific provision for distribution of residual assets to the employees, yet the union never contested the reversion clause in the trust agreement. Under these circumstances, giving effect to the reversion clause would not contravene the federal labor policy favoring negotiation.

Plaintiffs further argue that the surplus in the trust fund was not due to actuarial error, but rather to the schedule of contributions established in the collective bargaining agreement. While paragraph eleven of the original trust agreement refers to surplus due to erroneous actuarial computation, Section 12.2(d)(i) of the 1975 trust agreement provides for the return of "residual assets" remaining after Plan liabilities have been satisfied. Thus, under the 1975 trust agreement, Eastern is not required to establish that the surplus was due to actuarial error. Section 1344(d)(1) does not specifically require that the residual assets be due to actuarial error.

■ In any event, authorities indicate that the surplus remaining after the purchase of annuities may be considered surplus due to actuarial error. In *Dyneer Corp.,* 747 F.2d at 337, the Sixth Circuit applied the Internal Revenue Service's definition of actuarial error, which provides that when pension liabilities are discharged through the purchase of insurance contracts, "the remaining assets may be considered surplus arising from actuarial error" (quoting Rev.Rul. 83–52, 1983–13 C.B. 87). The surplus funds here meet that definition.

Even assuming that proof of actuarial error is required, the evidence in the record indicates that actuarial error is the cause of the overfunding here. Contributions are required under Section 10.1 in "such sums as are required, in accordance with sound actuarial practices." Mr. Toth, who worked in the Steelworkers Pension, Insurance and Unemployment Benefit Department, testified in his deposition that the union had employed the services of an actuary, and he referred to actuarial charts in a 1978 letter to counsel for Eastern which he indicated during his deposition as being "boilerplate" from a union agreement. (Toth Dep. pp. 19–21; Dep. Ex. 8). Mr. Toth further states in his letter that "we are not opposed to using the company's actuarial equivalents" and requests "a copy of the company's tables in order for our actuary to check out their reasonableness." He also suggests making the actuarial tables a part of the plan. (Dep. Ex. 8). Thus, the evidence suggests that the formula for contributions in the collective bar-

gaining agreement was arrived at using actuarial data, and plaintiffs have submitted no evidence to the contrary.

Plaintiffs also assert, as a matter of policy, that to allow Eastern to recover the surplus would result in Eastern receiving a windfall. Even characterizing it as a windfall, it is one authorized by statute if the requirements of § 1344(d)(1) have been met. The concept of surplus codified in the statute is not new, but rather stems from the common law of trusts, which employs the term to describe any assets remaining in the trust after its purpose has been fulfilled. *Wilson,* 819 F.2d at 464. Under common law, a resulting trust in the surplus for the benefit of the creator of the trust arises by operation of law unless a contrary intent was manifested. *Id.,* citing Restatement (Second) of Trusts § 430 (1959). Defendants argue that under the circumstances of this case, plaintiffs would receive a windfall if they prevail.

The Sixth Circuit noted in *dicta* in *Bryant,* 793 F.2d at 123–24, that its decision precluding the recovery of surplus by the employer would not result in a windfall for the employees, and that an award of surplus to the employer would have been a windfall for the employer. At the time *Bryant* was decided, there was no income tax on the reversion of pension fund assets to the employer, although the court noted that a ten percent excise tax had been proposed in 1986. *Id.* Under the present version of 26 U.S.C. § 4980(d), a fifty percent tax is imposed on any employer reversion from a qualified plan unless the employer establishes a replacement plan or amends the plan to provide for increased benefits. Thus, at this point an employer recouping surplus will not receive a windfall due to the tax laws.

Additionally, it has been noted that "participants benefit more from a policy that encourages employers to fund pension plans generously than from a policy that entitles plan participants to surplus assets and thereby discourages employers from potentially excessive funding." *Eager v. Savannah Foods & Industries, Inc.,* 605 F.Supp. 415, 420 (N.D.Ala.1984). Plaintiffs, "in the absence of an agreement to the contrary, have no right to a windfall resulting from an employer's overly generous contributions to the plan." *Washington-Baltimore Newspaper Guild,* 555 F.Supp. at 261.

In summary, the court finds that neither § 1344(d) nor public policy precludes the recovery of surplus assets in this case. The court concludes from the evidence that the trust agreement should be considered a part of the Plan for purposes of § 1344(d), and that no genuine issue of material fact has been demonstrated which would preclude this result. The trust agreement establishes defendants' right to recover the surplus, and defendants' motion for summary judgment as to Counts One and Two is well taken.

Defendants also assert that they are entitled to summary judgment on Count Three of the amended complaint, which alleges a breach of fiduciary duty on the part of Eastern under 29 U.S.C. § 1104(a). It is alleged in Count Three that Eastern breached a fiduciary duty owed to Plan participants by not using the surplus in the trust fund to increase pension benefits. Defendants argue that Eastern was acting as an employer, not a fiduciary, in terminating the Plan, and that therefore Eastern cannot be held liable under Count Three.

An employer does not necessarily act in the role of fiduciary with respect to all actions taken in regard to an employee benefit plan. *Musto v. American General Corp.,* 861 F.2d 897 (6th Cir.1988). In making the decision to terminate a benefit plan, an employer acts as an employer, not as a fiduciary. *Id.* Eastern would not be liable for breach of fiduciary duty for its decision to terminate the Plan. However, Eastern would still be responsible, in the event of termination, for ensuring that any liability for benefits due to participants was discharged in accordance with the terms of the Plan.

Under 29 U.S.C. § 1104(a), a fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the

exclusive purpose of providing benefits to participants and beneficiaries "in accordance with the documents and instruments governing the plan." As discussed above, the Plan in this case, incorporating the related trust agreement, provides for the recoupment of residual assets by Eastern, not for the distribution of those assets to participants. Therefore, Eastern's recoupment of those assets is "in accordance with the documents and instruments governing the plan," and Eastern did not breach its fiduciary duties by failing to distribute those assets as an increase in pension benefits. Further, Eastern did not breach any fiduciary duty owed to participants when it included the recoupment provision in the trust agreement. At the time the recoupment provision was included in the trust agreement, Eastern had the authority under the Plan to establish the terms of the plan and the trust agreement, and was not precluded by any other terms of the Plan, trust agreement or collective bargaining agreement from providing for recoupment of surplus assets by Eastern. Defendants are entitled to summary judgment on Count Three.

■ In Count Four, plaintiffs assert a claim of promissory estoppel. Plaintiffs allege that Eastern made representations in the Summary Plan Description and otherwise to the effect that surplus assets would be distributed to the participants. To the extent that plaintiffs' claim is based upon state law, it is preempted by ERISA under 29 U.S.C. § 1144. *See e.g. Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290 (5th Cir.1989). Courts have held that a trustee of a plan may not bind the fund through estoppel to make payments not required under the plan. *Hansen v. Western Greyhound Retirement Plan*, 859 F.2d 779 (9th Cir.1988); *Moore v. Provident Life & Accident Ins. Co.*, 786 F.2d 922 (9th Cir.1986); *Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032 (2d Cir.1985). Courts have also declined the invitation to expand ERISA's exclusive remedial scheme through the mechanism of developing a federal common law of ERISA. *See e.g. Morales*, 914 F.2d at 87.

In *Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir.1990), cited by plaintiffs, the court recognized an estoppel claim but confined its holding to unfunded employee benefit plans and specifically excluded pension plans from the scope of its decision. Thus, it is distinguishable.

Plaintiffs also rely on *Edwards v. State Farm Mutual Automobile Ins. Co.*, 851 F.2d 134 (6th Cir.1988). *Edwards* involved a situation where information in the plan summary conflicted with provisions in the actual plan, and plaintiffs relied on the plan summary, which was inaccurate and therefore violated 29 U.S.C. § 1022. The court in *Edwards* found that the plan fiduciaries were bound by the statements in the plan summary and that the decision to deny benefits was arbitraty and capricious in light of the summary plan language. *Id.* at 136–137. However, *Edwards* is not analogous to the present case. Plaintiffs have pointed to no language in the plan summary which is inaccurate or which would constitute a representation that they would be entitled to any surplus remaining after the full funding of pension benefits. In fact, the summary plan description states that "No part of the fund can be diverted or used for any purpose except for the exclusive benefit of Members *except where a contribution was made by mistake* ..." (Emphasis supplied). (Defendants' Motion Ex. 2, p. 2). Although plaintiffs argue that this language refers to the recoupment provisions of 29 U.S.C. § 1103(c)(2)(A)(i), which allows for the return of erroneously made contributions within one year after the payment of the contributions, the summary plan description, which constitutes the language upon which plaintiffs allegedly relied, contains no such limitation.

Even if this court were to find that plaintiffs may assert an ERISA estoppel claim, plaintiffs have produced no evidence to support such a claim. There is no evidence of representations in the summary plan description, the Plan itself or from other sources upon which plaintiffs could have

reasonably based the conclusion that the surplus in the trust fund would be distributed to them upon termination of the Plan. Defendants are entitled to summary judgment on Count Four.

In Count Five, plaintiffs allege that Eastern is liable under 29 U.S.C. §§ 1021(a) and 1132(c)(3) due to the failure of the summary plan description to state that the trust agreement provided for the reversion of surplus. Plaintiffs have not stated a claim against Eastern under § 1132(c), since that section requires that a request for information be made to the administrator to which the administrator refuses a reply. *First Atlantic Leasing Corp. v. Tracey*, 738 F.Supp. 863 (D.N.J.1990). Plaintiffs have not alleged in Count Five that a request for information was not honored by Eastern, nor have they produced any evidence to that effect.

Section 1021(a) provides that a summary plan description containing the information specified in 29 U.S.C. § 1022(b) must be furnished to plan participants. The list of information in § 1022(b) does not specifically include the details of plan termination. While § 1022(b) may require the inclusion of information concerning plan termination in the plan summary where that information bears upon benefits payable under the terms of the plan, such information is not essential where, as here, the termination provision at issue has no impact on pension benefits to which the participants are entitled under the terms of the Plan. The summary plan description in the present case did inform participants that no funds could be diverted "except where a contribution was made by mistake ..." (Defendants' Motion Ex. 2, p. 2), thereby alerting them to the possibility that parts of the fund attributable to actuarial error would be recovered by Eastern.

Further, plaintiffs must show a substantial lack of compliance with ERISA's reporting and disclosure requirements, with resulting substantial harm to the employees, before a nondisclosure violation of § 1021(a) is subject to redress as arbitrary and capricious behavior. *See Blau v. Del Monte Corp.*, 748 F.2d 1348

(9th Cir.1984). Mere technical noncompliance with no showing of substantial harm or egregious behavior on the part of the employer does not entitle plaintiffs to relief. *Simmons v. Diamond Shamrock Corp.*, 844 F.2d 517 (8th Cir.1988).

Here, the plaintiffs were informed in the summary plan that contributions made by mistake might be diverted. Unlike *Blau*, there is no evidence, despite plaintiffs' bare, unsupported allegations to the contrary, that defendants attempted to hide the terms of the trust agreement from the employees. Rather, as noted previously, the Plan and trust agreement were available for inspection by the employees. The Plan makes repeated references to the trust and trust agreement, and those references were such as to reasonably alert the employees that the management and distribution of Plan assets was governed in part by the trust agreement. The court finds that no evidence has been produced which would create a genuine issue of material fact on the issue of whether defendants acted arbitrarily and capriciously in the reporting of Plan provisions. There has been substantial compliance with § 1021(a) and defendants are entitled to summary judgment on Count Five.

Count Six alleges that the collective bargaining agreement does not permit Eastern to recapture the surplus, and therefore, such an act would violate the collective bargaining agreement and 29 U.S.C. § 185. Count Seven alleges that since the recoupment by Eastern of the surplus would violate the collective bargaining agreement, it would also violate § 1344(d)(1)(B).

Plaintiffs have produced no evidence of any clause in the collective bargaining agreement which prohibits the recovery of surplus by Eastern, or which provides for the distribution of surplus to the plaintiffs. Since there is no provision in the collective bargaining agreement which would preclude Eastern from recovering the surplus, Eastern would not violate the terms of the collective bargaining agreement in recovering the surplus, nor has any violation of § 185 been established.

See *Gavie v. Stroh Brewery Co.,* 668 F.Supp. 608, 613 (E.D.Mich.1987) (breach of a contractual duty contained in the collective bargaining agreement required for a § 185 claim). The fact that plaintiffs now feel that a specific provision permitting distribution of surplus to them should have been included in the collective bargaining agreement is not sufficient to create a contractual obligation on the part of Eastern. Plaintiffs had the option to negotiate for a specific provision to that effect, yet did not do so.

■■■ The fact that the collective bargaining agreement does not specifically refer to the trust agreement and termination provisions or provide for recoupment of the surplus by Eastern does not preclude Eastern from proceeding under the terms of the trust agreement, as there is no provision in the collective bargaining agreement which would preclude it from doing so. However, even if it is assumed that enforcement of the trust provision was dependent upon the acceptance of the trust by the parties through the collective bargaining agreement, the evidence before the court suggests that this was the case here. As noted above, Appendix C to the 1974 collective bargaining agreement states that Eastern agreed to continue the present "Pension program." (Defendants' Reply Ex. 20, Reg. Admissions No. 44). The present "program" included not only the Plan, but also the trust agreement. The Plan authorizes Eastern as plan administrator to enter into a trust agreement. The trust agreement was referred to several times in the Plan, including a reference in Section 18.1 that employees would be entitled to participate "in accordance with the terms of the Plan and such Agreement of Trust." No evidence has been produced to indicate that the union or plaintiffs ever expressed an intent during negotiations or otherwise that the surplus be distributed to plaintiffs, nor has any evidence been offered which would establish a violation of the collective bargaining agreement, and no genuine issue of material fact exists as to Counts Six and Seven.

In accordance with the foregoing, defendants' motion for summary judgment is granted, and plaintiffs' cross-motion for summary judgment is denied. The clerk of courts shall enter judgment for defendants.