Darrell ALBEDYLL, Jane Albedyll, Rachel Albedyll, Michael Andreas, Ronald Ary, Judy Bakken, Orville Becker, Helen Bishofberger, Russell Brill, and Antoinette Bronner, et al., Plaintiffs–Appellees,

v.

WISCONSIN PORCELAIN COMPANY REVISED RETIREMENT PLAN, Wisconsin Porcelain Company, a Missouri General Partnership, Donald W. Bussmann, Joseph J. McCabe, and James F. Bussmann, as Trustees of the Plan and in their individual capacities, Defendants–Appellants.

Nos. 89–3067, 89–3453 and 89–3622.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1991.

Decided Oct. 22, 1991.

John D. Varda, Jon P. Axelrod, William D. Mollway, John H. Lederer (argued), Dewitt, Porter, Huggett, Schumacher & Morgan, Madison, Wis., for plaintiffs-appellees.

Richard M. Burnham, Earl H. Munson, LaFollette & Sinykin, Madison, Wis., Willis J. Goldsmith (argued), Patricia A. Dunn, Laurie W. Finneran, Jones, Day, Reavis & Pogue, Washington, D.C., for defendants-appellants.

Before BAUER, Chief Judge, CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

In 1976 the "active partners" of Wisconsin Porcelain Company—six of the more than twenty-member partnership—amended the company's pension plan to provide, among other things, for reversion of surplus plan assets to the partnership if the plan were terminated. In 1988 the four "managing partners" terminated the plan as part of their duties in winding up the partnership's affairs. Once the participants and beneficiaries had been paid, the managing partners attempted to have the remainder of the surplus assets distributed to the partners. But plaintiffs sued, claiming that the 1976 amendment was void because not all partners had signed it, as required by the plan's amendment procedure. The district court agreed with the participants, and the plan, company and trustees then appealed.

I.

A. *Background*

Wisconsin Porcelain (WPC) was a general partnership that owned and operated a

porcelain products business. In 1947 the partners of WPC executed a trust agreement that established the company's pension plan. Paragraph 15.04 of the plan provided for *pro rata* distribution to participants upon termination.[1] An outline of the plan distributed to employees in January 1948 [2] and the outline distributed with membership certificates [3] implied that the company could not recover plan assets.

The 1947 trust agreement was amended and revised in 1952 by all of the partners to become a self-insured plan; no change was made in the provision covering surplus assets. (We call the 1952 version the "Prior Plan.") Article 11 of the 1952 plan specified the amendment procedure:

11.01. Except as hereinafter provided, the Company shall have the right to amend the Plan at any time and from time to time and to any extent that it may deem advisable.

11.02. Any such amendment shall be set out in writing and executed by all of the partners of the Company. Upon delivery to the Trustees by the company of such amendment, this Plan shall be deemed to have been amended in the manner and to the extent set forth in said amendment.

11.03. No amendment shall have the effect (at any time prior to the satisfaction of all liabilities under the Plan with respect to Participants under the Plan, former Participants under the Plan, or their beneficiaries) of using or diverting any part of the contributions of the Company or of such Participants or the income of the trust for purposes other than the exclusive benefit of such Participants or their beneficiaries.

Article 13 governed termination. It provided in relevant part:

13.01. The Company has established the Plan with the bona fide intention and expectation that from year to year its Active Partners will deem it advisable to make contributions and to provide the benefits herein established. However, the Company realizes that circumstances not now foreseen may make it necessary or desirable, and the Company reserves the right, to change or discontinue the Plan at any time.

13.02. In the event that the Company decides to discontinue the Plan and not to continue to provide the benefits, herein provided, which are still unfunded, such decision shall be evidenced by an instrument in writing executed in the name of the Company by its Active Partners. Such instrument shall be delivered to the Committee [4] and as soon as possible thereafter the Committee shall send or deliver to each then Participant under the Plan and to the Trustees a copy of said instrument. The Company's deci-

---

1. The paragraph provides:
 15.04. In the event of such discontinuance, the rights and privileges of each then Participant shall be the same as those provided in event of termination of employment of a Participant on account of total and permanent disability, excepting that the benefits available to each Participant shall be determined in the ratio of the actuarial value at the time of such termination of his earned pension credits to the actuarial value of the earned pension credits to date of termination of all Participants under the Plan (subject to the provisions of Article 9 hereof). In such event, the Trustees shall continue the trust toward the provisions of these reduced benefits, in accordance with the directions of the Committee.

2. The outline stated in part:
 XI. *Non-recovery by Wisconsin Porcelain of its contributions:*
 The plan is for the exclusive benefits of all members thereof and their beneficiaries.

Wisconsin Porcelain Company can neither recover any of its contributions to the plan nor any of the principal nor income of the funds created by the plan.
Supp.App. of Plaintiffs–Appellees at 306 (R. 40, ex. 3).

3. One provision stated:
 If a change, modification, or termination of the plan becomes necessary, all money previously contributed by the Company and the employees remains in the pension fund and will eventually be distributed to participants in the plan. Such distributions naturally will be in proportion to each participant's earnings and length of service.
 *Id.* at 311 (R. 40, ex. 5).

4. Article 2 of the Prior Plan provided that the three-member trust committee appointed by the active partners was responsible for plan administration and management.

sion shall be effective upon such date as it may specify.

WPC amended the Prior Plan in 1956, 1958 and 1966, with all partners assenting to each change. The partnership sought again to amend the plan in 1976 (resulting in what we call the "Revised Plan"), in part to respond to the recent enactment of the Employee Retirement Income Security Act of 1974 (ERISA), Pub.L. 93–406, 88 Stat. 832 (codified as amended at 29 U.S.C. §§ 1001–1461 (1988)). The 1976 amendment also included a provision to divert residual assets to the partners upon termination:

> 11.05. Subject to the limitations contained in § 4044(b) of the Employee Retirement Income Security Act of 1974, any funds remaining after the satisfaction of all liabilities to such members, qualified terminated members, retired members, disabled members, beneficiaries, spouses, and contingent beneficiaries under this plan due to erroneous actuarial computation shall be returned to the employer.[5]

Unlike previous amendments, this one was signed by only the six active partners. The 1976 summary plan description, distributed to participants, did not discuss distribution rights upon termination.

The WPC partnership, now comprising ninety-one partners, was dissolved on December 31, 1986, pursuant to the fifty-year-old 1943 partnership agreement. All company assets except plan assets were sold. In a Wisconsin state court judgment of October 12, 1988, the court held that the management committee—four partners, not all of whom were active partners—had proper authority to wind up the partnership's affairs. On May 23, 1988, the four managing partners adopted a resolution terminating the plan, which provided that the plan's residual assets would revert to the company. The resolution also provided that "the Plan and Amendments thereto are hereby ratified and confirmed." The trustees notified participants and made necessary filings with the Internal Revenue Service and Pension Benefit Guaranty Corporation, neither of which objected to termination.

The partnership subsequently had each of the ninety-one general partners execute a "Ratification/Amendment" during November and December 1988, which purported to ratify the 1976 amendments or, in the alternative, to adopt a new amendment directing that any surplus be returned to the employer. On December 15, 1988, the plan distributed lump-sum benefit payments to the beneficiaries. It also distributed $1,534,387.22 of the $5,798,656.22 in surplus assets to the participants, pursuant to the regulatory requirement that surplus assets attributable to employee contributions be returned. 29 C.F.R. § 2618.31 (1990). That left a surplus of roughly $4,200,000, which remains to be distributed.

### B. District Court Holding

The district court found on summary judgment that the Revised Plan's reversion provision was invalid and that the surplus assets should go to the beneficiaries and participants. The court reasoned that, because the 1976 amendment was signed by only the *active* partners, it did not conform with the plan's explicit requirement that *all* partners must approve. The court also held that the attempted reversion violated ERISA's prohibition of employer reversions in the absence of a provision explicitly so providing.[6] In so holding, the court dis-

---

**5.** Amended paragraph 13.15 clarifies that this is WPC's only means of recovering the surplus assets:

> 13.15. The employer shall be entitled to no part of the corpus or income of the trust fund and no part thereof shall be used for or diverted to purposes other than for the exclusive benefit of the members and beneficiaries hereunder, except as provided in § 11.05 herein at the time of termination of the plan and trust.

**6.** The statute provides:

> Any residual assets of a single-employer plan may be distributed to the employer if—
> (A) all liabilities of the plan to participants and their beneficiaries have been satisfied;
> (B) the distribution does not contravene any provision of the law; and
> (C) the plan provides for such a distribution in these circumstances.

29 U.S.C. § 1344(d)(1) (1988). Not abiding by this exception results in reversion to the partici-

counted a bevy of arguments offered by WPC. We review those contentions relevant to this appeal.

First, WPC contended that the plan authorizes amendments required for continued approval under the Internal Revenue Code (or, by extension, ERISA).[7] The court concluded that, even if portions of the amendment were necessary to maintain qualified status, "the procedural requirements of § 11.02 in no way hindered the ability of the plan to adopt amendments which would bring it in compliance with the Internal Revenue Code." Order at 18. Moreover, the court concluded that permitting the amendment without all partners' approval violated ERISA's requirement that a qualified plan have a specific amendment procedure. 29 U.S.C. § 1102(b)(3).

Second, the court rejected WPC's argument that the 1947 partnership agreement authorizes the active partners to act on behalf of all partners. The court noted that the 1947 and 1952 trust agreements clearly allocated responsibilities between active partners and all partners. The court noted in this regard that all partners had signed previous amendments.

Third, the court dismissed the argument that the amendment was endorsed through the "ratification and amendment" signed by all partners following the termination. The court found that this procedure violated ERISA's prohibition of post-termination amendment, citing *Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.*, 624 F.2d 513 (4th Cir.1980). WPC contended that ratification differs from amendment in that the principal ratifies the agent's action as of the time of the earlier action, not of the ratification. The court concluded, however, that ratification must take place before termination, since the partners lose authority to amend at the time the plan terminates. "[T]he act of ratification took place after the partnership lacked authority to make such amendment." Order at 23.

WPC filed a Rule 59(e) motion for reconsideration, arguing, in a new twist, that laches barred the plaintiffs' challenge and that the termination itself was invalid because only the managing partners—and not the active partners—had authorized it. The court found these arguments new, but then held that laches did not bar the action and that the managing partners, by virtue of their authority to wind up the partnership's affairs, enjoyed the discretion to serve, in the termination, as the "company," which was not more specifically defined in paragraph 13.02. This appeal followed.

## II.

■ Initially we must contend with a sticky jurisdictional issue. The district court entered final judgment on May 26, 1989, and denied WPC's motion for reconsideration on September 7, 1989. The first notice of appeal, filed September 20, 1989, contained a caption reading, "DARRELL ALBEDYLL, et al., Plaintiffs, v. WISCONSIN PORCELAIN COMPANY REVISED RETIREMENT PLAN, et al., Defendants." The body of the notice stated that the "above-named defendants" appeal.

Fed.R.App.P. 3(c) provides:

The notice of appeal shall specify the party or parties taking the appeal; shall designate the judgment, order or part thereof appealed from; and shall name the court to which the appeal is taken.... [T]he use of the term "et al." in a notice of appeal is insufficient to indicate an unnamed litigant's intention to appeal. *Torres v. Oakland Scavenger Co.*, [487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285] (1988).

On November 8, 1989, the defendants filed opening briefs and appellees filed a motion to dismiss the appeal due to the defective form of the notice of appeal. On the same day the defendants filed a motion in district

---

pants according to regulated formulae. 29 C.F.R. §§ 2618.30(2)(b), 2618.32(a) (1990).

**7.** The paragraph, appearing in both the Prior and Revised Plans, provides:

11.04. No amendment of the Plan, required as a condition of the approval of the Plan under Section 165(a) of the Internal Revenue Code, shall be deemed contrary to the limitation upon amendments in this Article 11 provided.

court for a finding of excusable neglect and an extension of time to file a new notice, under Fed.R.App.P. 4(a)(5).[8] At a hearing on November 22, the district court found excusable neglect for the misstep, and on November 29, WPC filed another notice of appeal. Appellees again moved to dismiss these appeals, and we decided to hear the jurisdictional argument with the merits of this case.

It is clear that WPC's first notice of appeal fails, as a matter of jurisdiction, to comply with Rule 3(c). *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), makes clear that "et al." is insufficient to confer jurisdiction over the others referred to by "al." Our law has adapted to *Torres's* strict rule:

> *Torres* changed the law in this circuit. It requires us to insist on punctilious, literal, and exact compliance with the requirement in Rule 3(c) that the notice of appeal (or its functional equivalent, if but only if no notice of appeal is filed) "shall specify the party or parties taking the appeal." The appellant must be named in the notice of appeal; naming him in the caption, or in collateral documents ... will not do.

*Allen Archery, Inc. v. Precision Shooting Equip., Inc.*, 857 F.2d 1176 (7th Cir.1988) (per curiam). The notice here is technically defective because it names no appellants in the body and only the plan in the caption. Defendants nonetheless argue that the first notice is adequate because the plan can sue and be sued under ERISA, 29 U.S.C. § 1132(d) (1988), and is the one appellant clearly identified in the notice. However, permitting the plan to proceed independently might lead to inconsistent judgments among the defendants, since the district court order would remain in effect as against the trustees and the partnership. *See generally* 9 J. Moore & B. Ward,

Moore's Federal Practice ¶ 204.11[4] (1991) ("general principle that a judgment will not be altered on appeal in favor of a party who did not appeal also applies to cases in which the interests of the party not appealing are aligned with those of the appellant").

This does not end our inquiry, however, since the defendants here sought a finding of excusable neglect. Although the issue is very close and unsettled among the circuits, we think that the initial notice of appeal supports a finding of excusable neglect. Initially, we reiterate that literal compliance with Rule 3(c) is *always* preferred and, as the Supreme Court made clear in *Torres*, a matter of jurisdiction. Moreover, naming a defendant in the caption is generally insufficient. *Bigby v. City of Chicago*, 871 F.2d 54, 56 (7th Cir. 1989); *Allen Archery, Inc.*, 857 F.2d at 1177. We agree that a finding of excusable neglect is rare:

> The history of the "excusable neglect" standard thus clearly indicates that, with the exception of "extraordinary cases where injustice would otherwise result," few circumstances will ordinarily qualify under the excusable neglect rubric.

*Reinsurance Co. of Am., Inc. v. Administratia Asigurarilor de Stat*, 808 F.2d 1249, 1251–52 (7th Cir.1987) (quoting *Files v. City of Rockford*, 440 F.2d 811 (7th Cir. 1971)) (footnote omitted). Cases in this circuit have held unmistakably that unfamiliarity with rules generally does not permit a finding of excusable neglect. *Varhol v. National R.R. Passenger Corp.*, 909 F.2d 1557, 1563 (7th Cir.1990); *accord In re Cosmopolitan Aviation Corp.*, 763 F.2d 507, 515 (2d Cir.) ("The excusable neglect standard can never be met by a showing of inability or refusal to read and comprehend the plain language of the federal rules."),

---

**8.** In relevant part:

The district court, upon a showing of excusable neglect or good cause, may extend the time for filing a notice of appeal upon motion filed not later than 30 days after the expiration of the time prescribed by this Rule 4(a). Any such motion which is filed before expiration of the prescribed time may be *ex parte* unless the court otherwise requires. Notice of any such motion which is filed after expiration of the prescribed time shall be given to the other parties in accordance with local rules. No such extension shall exceed 30 days past such prescribed time or 10 days from the date of entry of the order granting the motion, whichever occurs later.

Fed.R.App.P. 4(a)(5).

*cert. denied*, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985). In another case we explained:

Excusable neglect is limited to an occurrence of unusual circumstances in which failure to grant an extension would result in injustice, such as the failure to learn of the entry of judgment. "[F]ailure to learn of the entry of judgment will support a finding of excusable neglect, as will uncontrollable delays in the delivery of mail, unpredictable events that affect the delivery of the notice of appeal to the clerk, unpredictable events that affect the feasibility of appeal, and plausible misconstructions, but not mere ignorance, of the law or rules."

*Parke–Chapley Constr. Co. v. Cherrington*, 865 F.2d 907, 911 (7th Cir.1989) (quoting *Redfield v. Continental Casualty Co.*, 818 F.2d 596, 602 (7th Cir.1987)).

We have recognized one exception to literal compliance. In *Hartford Casualty Ins. Co. v. Borg–Warner Corp.*, 913 F.2d 419 (7th Cir.1990), we held that when the caption and notice, read together, provide an unmistakable statement as to who the appellants are, that is, when "[w]e do not have to go outside the four corners of this notice of appeal, set forth on one sheet of paper, to ascertain who is appealing from the district court's judgment," *id.* at 419, the filing is in most cases adequate for Rule 3(c) purposes. Appellees correctly point out that in *Hartford Casualty* all of the parties taking the appeal were listed in the caption, which is not the case here. However, all of the defendant parties here have identical interests, and the district court's judgment against the trustees is effectively a judgment against the plan, the plan's trustees and the partnership. Although only the plan is listed in the original notice of appeal, the decision-makers are the trustees and the trustees are members of the partnership. The plan could not have appealed without being joined by the trustees and the partnership. For purposes of appeal, the plan is the *alter ego* of the trustees and of the partnership. The plaintiffs-appellees clearly recognize this, and there was absolutely no question as to the singularity of interests here. We may

therefore rely on *Hartford Casualty's* rule that where the contents ("four corners") of the document leave no room for doubt as to who is taking the appeal, a notice of appeal may suffice, not necessarily as adequate in itself but as a basis for a finding of excusable neglect. *See Parke–Chapley*, 865 F.2d at 911 ("attorney's good faith misinterpretation of a procedural rule may represent such excusable neglect that it would not necessarily be an abuse of discretion for a district court to grant an extension on this basis").

■ A word about the district court's excusable neglect holding is in order. The judge based his oral finding of excusable neglect on three factors. First, he noted that there had been a general practice in the filings in the case—including his own rulings—to use the "et al." format. Second, he found "that there has not been the failure to appropriately research the matter, but perhaps that there have been certain decisions which counsel for the defendants were perhaps unable to uncover and resolve." Tr. at 9. Finally, he found no prejudice, since the plaintiffs clearly understood who the parties taking the appeal were.

The judge's first two reasons are not adequate for a showing of excusable neglect. First, there is little room for confusion about the rule. It is clear, it is neither obscure nor arcane and it has been the subject of a Supreme Court case now cited in the rule's text. The district court's use of "et al." does not change the requirements of the rules of appellate procedure, especially since another rule, Fed.R.Civ.P. 10(a), provides that for most pleadings *other than the complaint*, "it is sufficient to state the name of the first party on each side with an appropriate indication of other parties." Second, counsel's research efforts—no matter how circumscribed—could not excuse missing the clear language of a well-known rule, mentioned in this circuit's practice manual and in the cases cited above. Finally, an appellee's actual knowledge of the appellants who are taking an appeal is generally insufficient to meet the rule's requirement, as the Supreme Court

indicated in *Torres. See Hartford Casualty*, 913 F.2d at 422 ("lack of confusion over the putative appellants is an irrelevant inquiry after *Torres* ").

However, in this case the lack of prejudice warrants a finding of excusable neglect since there was simply no mistaking who took the appeal. For the plan to appeal, it was inescapable that the trustees and the partnership participate. We therefore believe that the district court correctly found excusable neglect, consistent with the Supreme Court's statement that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Foman v. Davis*, 371 U.S. 178, 181–82, 83 S.Ct. 227, 229–30, 9 L.Ed.2d 222 (1962); *cf. Feeder Line Towing Serv., Inc. v. Toledo, Peoria & W.R.R. Co.*, 539 F.2d 1107, 1109 (7th Cir.1976) (pre-*Torres* holding that excusable neglect is open to many situations in which tardiness is excusable).

### III.

■ This brings us to the merits. This case arises under ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1), and under trust law. Because the district court entered summary judgment, our review is *de novo*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), and we give the non-moving party the benefit of inferences from the stipulated facts, *Jeffries v. Chicago Transit Authority*, 770 F.2d 676, 679 (7th Cir. 1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986). WPC makes several arguments as to why the partnership is entitled to the surplus assets. We review each in turn.

### A. *WPC's "Intent" That All Partners Need Not Execute Amendments*

■ WPC claims the district court ignored WPC's intent, pursuant to the Revised Plan's paragraph 11.04, that it not be required that all partners execute amendments when those amendments are necessary to ensure the plan's tax-qualified status. WPC argues that because the 1976 amendment altered the plan to conform with ERISA vesting and participation requirements, it need not have been signed by all partners.

We reject this argument for several reasons. First, this interpretation expands the exception beyond its clearly intended scope. A change in the reversion provision—especially one adopted in a manner inconsistent with the plan's prescribed amendment procedure—was not necessary to comply with either tax requirements or ERISA. The abbreviated authorization procedure simply was not "required as a condition of the approval of the Plan" since without the amendment the surplus assets would, without violating ERISA, go to the beneficiaries and participants. Even if the amendment's ERISA-mandated provisions meet the exception, there is no reason for the reversion provision also to escape paragraph 11.02.

Second, the provision violates ERISA's prohibition of reversion to employers unless a plan provision, *properly enacted*, covers such a contingency. 29 U.S.C. §§ 1103(c)(1), 1344(d)(1); 29 C.F.R. § 2618.-32(a), (b). One function of ERISA is to establish clearly when rights shift from participants to employers, and permitting an 11.04 exception here would circumvent this clear purpose.

Third, we think that the phrase "limitation upon amendments" in paragraph 11.04 conflicts with the partnership's specific reservation to *all partners* of the right to amend the plan. *Restatement (Second) of Trusts* § 331(1) comment d ("If the settlor reserves a power to modify the trust only in a particular manner or under particular circumstances, he can modify the trust only in that manner or under those circumstances."). The plan clearly reserves amendment authority to *all* partners for changes not required by law.

### B. *Compliance with Plan Provisions*

■ WPC makes two related arguments as to why "mechanical application" of the plan's amendment procedure "improperly

elevates form over substance." Appellants' Br. at 32. First, it claims that strict adherence to the procedure violates ERISA because the portions of the amendment changing the plan to comply with ERISA are also invalid. However, the changes to vesting and other plan features were required for the plan to maintain its qualified status and therefore fall within the scope of paragraph 11.04. The change in allocation of fund surplus, however, came only at the behest of the partners and was *not* mandated by ERISA. The portions of an amendment improperly adopted need not taint the portions properly falling within an exception to the normal adoption procedure.

WPC cites *Aronson v. Servus Rubber*, 730 F.2d 12 (1st Cir.), *cert. denied*, 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 357 (1984), for the proposition that technical plan provisions can sometimes be overlooked when substantive compliance with plan requirements is achieved. In *Aronson* the "Company" reserved the right to amend the plan, whereas the "Company" with the approval of a pension committee had the right to terminate. The court held that even though only the committee took action to partially terminate the plan, the procedure was substantively sufficient since "[t]here is nothing in the plan requiring the Company to manifest its action in any particular manner." 730 F.2d at 15. *Aronson* would be more closely analogous if the amendment provision in WPC's plan had provided simply for "partnership" or "company" approval.

■ Second, WPC contends that the amendment is valid because it "effected no substantive harm." Appellants' Br. at 37. Cases from this circuit and others have held that remedies available under ERISA are sometimes limited by the type of violation by administrators. *Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F.2d 618, 621–22 (7th Cir.1987); *see also Adams v. Avondale Industries, Inc.*, 905 F.2d 943, 949 (6th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990); *Sage v. Automation, Inc. Pension Plan & Trust*, 845 F.2d 885, 895 (10th Cir.1988).

In *Kleinhans* a participant was ineligible for the substantive relief of a statutory penalty because he had not "requested" the information, as the penalty provision requires, and his only remedy under 29 U.S.C. § 1132(a)(3) was receiving the information he sought. In *Adams* a written plan amendment abrogating an unwritten severance pay provision was permitted even though the plan did not include a specific amendment procedure, as ERISA requires. The court allowed the amendment in part on the basis that administrators owed no fiduciary duty to participants in terminating or amending a plan. And in *Sage* the court held administrators not liable for minor variances from claims provisions because claimants had suffered no prejudice.

These cases are distinguishable because the WPC plan contained an explicit amendment procedure, the participants were harmed by its violation and ERISA and trust law provide a remedy. The loss of the surplus benefits is clearly a substantive harm, and claimants appear not even to have received notice. ERISA authorizes suits in a situation where participants or beneficiaries seek benefits due or enforcement or clarification of rights under a plan. 29 U.S.C. § 1132(a)(1)(B). ERISA also authorizes beneficiaries or fiduciaries to bring an action enjoining any act or practice violating ERISA or plan terms, or enforcing the provisions of ERISA or plan terms. 29 U.S.C. § 1132(a)(3). These provisions allowed participants to seek invalidation of the provision. Once the violation is established, beneficiaries are entitled to recovery of the surplus under either the terms of the Prior Plan or under ERISA's provision that surplus assets go to beneficiaries in the absence of an explicit provision to the contrary. 29 U.S.C. §§ 1103(c)(1), 1344(d)(1); 29 C.F.R. § 2618.30(b). The substantive remedy sought here is therefore provided by ERISA and trust law.

### C. *Managing Partners' Resolution to Terminate*

■ The managing partners' 1988 termination of the plan included the provision that "the Plan and Amendments thereto

are hereby ratified and confirmed." WPC argues that the Revised Plan was valid because the active partners, through the managing partners' termination in 1988, ratified the 1976 amendment.

 This argument suffers one fatal defect: there is no indication that *all* partners delegated authority to amend the plan to the managing partners, and defendants do not argue that all partners in fact delegated this authority. A settlor must clearly indicate the power delegated to an agent, and without a contrary provision, a withholding of authority reserves the power solely in the settlor. The active partners were responsible for the operational aspects of the partnership and therefore could delegate authority to the managing partner committee. But even if the managing partners had authority over the operations of the business (and its winding up), this does not include the power to amend, which was specifically reserved to *all* partners.

### D. *Reversion of Assets*

 Finally, WPC argues that, even if the 1976 amendment is invalid, the district court improperly interpreted the Prior Plan to preclude reversion to the company. WPC points to paragraph 11.03 of the Prior Plan, which provides:

> No amendment shall have the effect (at any time prior to the satisfaction of all liabilities under the Plan with respect to Participants under the Plan, former Participants under the Plan, or their beneficiaries) of using or diverting any part of the contributions of the Company or of such Participants or the income of the trust for purposes other than the exclusive benefit of such Participants or their beneficiaries.

WPC argues that once the plan satisfied "all liabilities," including benefit liabilities, the employer was entitled to the surplus. WPC further argues that employer reversion was an accepted practice in pre-ERISA situations.

This argument is not persuasive. First, paragraph 13.04 of the Prior Plan appears to provide for *pro rata* distribution of plan assets to the participants upon termination. Second, even if this plan provision is somewhat ambiguous, the 1948 outline clearly indicated that the company could recover none of the contributed assets. Third, even if pre-ERISA law permitted employer reversions, some indication that the plan intended such an outcome is necessary. Finally, under ERISA, which governs our interpretation, unless the plan specifically provides for reversion to the employer, surplus assets go to beneficiaries and participants. 29 U.S.C. § 1344(d)(1) (1988).

### IV.

We take jurisdiction of this case because the district court did not abuse its discretion in finding excusable neglect. The district court's decision invalidating the amendment providing for reversion of surplus assets to the employer and injunction requiring that the assets go to the participants are

AFFIRMED.