978 F.2d 265
 61 USLW 2299, 15 Employee Benefits Cas. 2708
 Carl RINARD, and all others similarly situated, Plaintiffs-Appellants,
v.
EASTERN COMPANY, Eastern Company Pension Plan for
Hourly-Rated Employees of The Pattin Manufacturing
Company Division, the Colonial Bank,
Defendants-Appellees.
 No. 91-3853.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 2, 1992.
Decided Oct. 28, 1992.
 
 1
 David Goldman, United Steelworkers of America, Pittsburgh, Pa., Timothy F. Cogan, Patrick S. Cassidy, O'Brien, Cassidy & Galagher, Wheeling, W.Va., William T. Payne (argued and briefed), Schwartz, Steinsapir, Dohrmann & Sommers, Los Angeles, Ca., for plaintiffs-appellants.
 
 
 2
 Juan Jose Perez (argued), Richard A. Frye (briefed), Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for defendants-appellees.
 
 
 3
 Before: MILBURN and SUHRHEINRICH, Circuit Judges; and COHN, District Judge.*
 
 
 4
 COHN, District Judge.
 
 I.
 
 5
 This is a class action under the Employee Retirement Income Security Act (ERISA). 29 U.S.C. § 1001, et seq. Plaintiffs-Appellants (Rinard) are ninety three former employees or the surviving spouses of former employees of the Pattin Manufacturing Company Division (Pattin Division) of Defendant-Appellee Eastern Company (Eastern). Also Defendants-Appellees are the Eastern Company Pension Plan for Hourly-Rated Employees of the Pattin Manufacturing Company (Plan), established under the collective bargaining agreement between the United Steelworkers of America (Union) and Eastern, and The Colonial Bank (Colonial), the trustee named in the funding mechanism provision of the Plan. Rinard claims that Eastern breached the collective bargaining agreement and also violated ERISA by taking for itself the surplus monies in the Plan after the purchase of annuities for Rinard on the termination of operations of Eastern's Pattin Division. The District Court, concluding that the surplus monies belonged to Eastern, granted Eastern summary judgment. Rinard v. Eastern Company, 769 F.Supp. 1416 (S.D.Ohio 1991). This appeal followed.
 
 II.
 
 6
 The Plan was unilaterally created in 1957, at a time when Eastern was non-unionized. The Plan as originally written provided for reversion of surplus assets to Eastern, stating, in relevant portion:
 
 
 7
 The Plan may be terminated at any time by the Board of Directors, in which event all of the funds of the Plan after providing the expenses of the Plan shall be used for the benefit of covered employees and pensioners, and for no other purpose, except that any funds not required to satisfy all liabilities of the Plan for pensions because of erroneous actuarial computations shall be returned to the Company.
 
 
 8
 The Plan utilized a previously created Agreement and Indenture of Trust (Trust Agreement) signed in 1952 between the Eastern Malleable Iron Company (now The Eastern Company) and The Hanover Bank as a funding mechanism. Three pension plans covering various employees groups of Eastern were described in the Trust Agreement as utilizing it as a funding mechanism. The Trust Agreement provided:
 
 
 9
 All amounts received by the Trustee from the Company under the Agreement shall constitute a single fund and may be comingled.
 
 
 10
 The Trust Agreement directed the Trustee to make payments from the funds held by the Trustee upon written demand of the retirement boards of the respective plans utilizing the Trust Agreement for funding. The Trust Agreement also provided that any surplus funds remaining on hand after satisfaction of the obligations of a particular Plan were to be returned to Eastern. Particularly, the Trust Agreement stated:
 
 
 11
 The Company reserves the right, at any time and from time to time, by action of its Board of Directors, to modify or amend in whole or in part, any or all of the provisions of this agreement, provided that no such modification or amendment shall be effective until filed with the Trustee and until the Company certifies to the Trustee that such modification or amendment does not make it possible for any part of the corpus or income of the Fund to be used for or diverted to purposes other than the exclusive benefit of employees or their beneficiaries or the administrative expenses of the Plan and further certifies that there may be returned to the Company upon the termination of the Fund, only such amount as may, due to an erroneous actuarial computation, remain in the Fund after the satisfaction of or provision for all liabilities with respect to such employees or their beneficiaries; and provided further that no such modification or amendment which affects the rights, duties or responsibilities of the Trustee may be made without its consent.
 
 
 12
 The Trust Agreement was amended in 1975 by an Amendatory Agreement signed by Eastern and Colonial, as successor trustee to The Hanover Bank. Neither the United Steelworkers, who by that time had become collective bargaining agent for the hourly-rated employees of the Pattin Division, nor the Retirement Board for the Plan signed the Amendatory Agreement. By 1975, six pension plans covering various employee groups of Eastern, including the hourly-rated employees of the Pattin Division, were identified in the Amendatory Agreement as using the Trust Agreement funding mechanism. Section 12.2 of the Amendatory Agreement contained the following provision relating to the return of surplus funds to Eastern:
 
 
 13
 In the case of the termination of the Plan, and if, but only if, the Plan is a defined benefit plan, any residual assets of the Plan may be distributed to the Company at the direction of the Administrator (or of a trustee appointed upon the application of the Pension Benefit Guaranty Corporation) if all liabilities of the Plan to participants and their beneficiaries have been satisfied and the distribution does not contravene any provision of law. The certificate of an enrolled actuary engaged by the Administrator pursuant to the Employee Retirement Income Security Act of 1974 stating that there are residual assets of the Plan remaining in the Fund after all liabilities of the Plan to participants and their beneficiaries have been satisfied shall be conclusive evidence of that fact, but in its discretion the Trust may require other evidence of that fact.
 
 
 14
 The United Steelworkers began representing hourly-rated employees of the Pattin Division in 1966. After the enactment of ERISA, Eastern and the Union modified the terms of the Plan to bring them into compliance with the terms of ERISA. The reversion provision of the Plan as originally written was not included in the "ERISAfied" Plan. The "ERISAfied" Plan became effective January 1, 1976.[1]
 
 
 15
 In 1987, Eastern sold its Pattin Division and terminated all of the division's employees. The trustee held Plan assets allocable to the Pattin Division in excess of the amount necessary to satisfy all vested employee pension rights. These rights were recognized through the purchase of annuities. Eastern claimed the surplus assets pursuant to the terms of the Amendatory Agreement. The Union claimed that the surplus was the property of the Plan and, therefore, should be distributed to the employees since neither the terms of the Plan nor ERISA allowed for its reversion to Eastern.
 
 III.
 A.
 
 16
 The distribution of surplus assets upon the termination of an ERISA plan is governed by 29 U.S.C. § 1344(d)(1), which provides:
 
 
 17
 (1) Subject to paragraph (3), any residual assets of a single-employer plan may be distributed to the employer if--
 
 
 18
 (A) All liabilities of the plan participants and their beneficiaries have been satisfied,
 
 
 19
 (B) the distribution does not contravene any provision of law, and
 
 
 20
 (C) the plan provides for such a distribution in these circumstances.
 
 
 21
 That all liabilities to plan participants and beneficiaries have been satisfied from the assets of the Plan, § 1344(d)(1)(A), is not disputed. Rinard does not contend that the reversion of the surplus would contravene any provision of law. § 1344(d)(1)(B). The dispositive issue is whether the terms of the Trust Agreement as amended are incorporated by reference in the terms of the Plan[2] in satisfaction of § 1344(d)(1)(C).
 
 B.
 
 22
 The District Court recognized that the terms of the "ERISAfied" Plan are silent on the reversion of any surplus and that there is "no language in the pension agreements specifically incorporating the terms of the trust agreement." 769 F.Supp. at 1422. The District Court reasoned, however, that the several references to a trust agreement contained in the Plan gave the employees "ample notice of the existence of the trust agreement and its role in the implementation of the Plan and the payment of benefits." Id. The District Court concluded that there is "sufficient reference to the trust in the Plan itself to incorporate the trust agreement as a plan document for the purposes of ERISA." Id.
 
 
 23
 The District Court in coming to its conclusion relied on Schuck v. Gilmore Steel Corp., 784 F.2d 947 (9th Cir.1986). In Schuck, a trust agreement provided that the surplus would revert to the employer. The pension agreement was silent on reversion of any surplus but referred to the creation of a trust to effectuate the pension plan. The Ninth Circuit, without pointing to any supporting authority or setting forth its reasoning, concluded that the trust agreement was incorporated into the pension plan in satisfaction of § 1344(d)(1)(C).
 
 C.
 1.
 
 24
 ERISA establishes a general requirement that plan assets be held in trust, 29 U.S.C. § 1103(a), (b), and creates a presumption that plan assets held under a trust agreement inure to the benefit of the employees. 29 U.S.C. § 1103(c). Section 1344(d)(1) sets out the conditions that must be met to overcome the presumption against any reversion. See text supra. These provisions, taken together, preclude reversion of surplus assets to an employer unless there is specific and affirmative compliance with the conditions of § 1344(d)(1)(C).
 
 2.
 
 25
 The Court of Appeals for the Seventh Circuit, in Albedyll v. Wisconsin Porcelain Co. Revised Retirement Plan, 947 F.2d 246 (7th Cir.1991), reasoned that an amendatory provision purporting to confer reversionary rights on the employer "violates ERISA's prohibition of reversion to employers unless a plan provision, properly enacted, covers such a contingency. 29 U.S.C. §§ 1103(c)(1), 1344(d)(1)." 947 F.2d at 254 (original emphasis). The Seventh Circuit concluded that "unless the plan specifically provides for reversion to the employer, surplus assets go to the beneficiaries and participants. 29 U.S.C. § 1344(d)(1) (1988)." 947 F.2d at 256 (emphasis added). See also International Union of Electronic, Electric, Salaried, Machine and Furniture Workers, AFL-CIO v. Murata Erie North America, Inc., 772 F.Supp. 870, 872 (W.D.Pa.1991) (§ 1344(d) "requires employers to insert an affirmative provision if they seek reversion in favor of themselves.")
 
 3.
 
 26
 The Plan did not specifically provide for the reversion of surplus assets to Eastern. Indeed, the reversion provision that existed in prior versions of the Plan was removed when the Plan was "ERISAfied." Given ERISA's clear presumption against reversion, we believe that the removal of the reversion provision reinforced the expectation of Plan participants and beneficiaries that any surplus would be distributed in the event of termination.
 
 
 27
 The Plan also failed to make any mention of incorporating the terms of the Trust Agreement.[3] In this context, the references in the Plan to a trust agreement are little more than a recognition of the existence of a trust and a restatement of the duty of the employer to segregate plan assets. 29 U.S.C. § 1103. We are of the opinion that the purposes of ERISA are contravened where the mere recognition of the duty and presumption created by § 1103 is treated as the equivalent of satisfying the requirements of the exception permitted under § 1344(d), as found by the District Court and in Schuck.
 
 D.
 
 28
 There is no reversion provision in the Plan itself and no express provision for incorporating the terms of the Trust Agreement in any of the provisions of the Plan. In sum, there is just no specific and affirmative compliance with the conditions of § 1344(d)(1)(C). Albedyll v. Wisconsin Porcelain Co. Revised Retirement Plan, 947 F.2d 246 (7th Cir.1991). Accordingly, we find that the surplus belongs to Rinard and must be equitably distributed to the plaintiffs under the supervision of the District Court. Therefore, the decision of the District Court is REVERSED and the case REMANDED for further proceedings consistent with this opinion. We do not retain jurisdiction.
 
 
 
 *
 Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 It is not disputed that the text of the Trust Agreement, either as originally executed or as amended, was not provided to the Union during the negotiation of the "ERISAfied" Plan. Rinard asserts that Eastern concealed the Trust Agreement. Eastern responds that the Union never requested the document. In either event, the terms of the Trust Agreement were not a subject of the negotiations
 
 
 [2]
 Rinard argues initially that incorporation of the terms of the Trust Agreement as amended into the terms of the Plan would violate the applicable regulations. 29 C.F.R. § 2618.1 et seq. The District Court correctly observed that there is no requirement in the regulations that the terms of an ERISA plan be contained in single document. Nor does the requirement of 29 U.S.C. § 1102(a)(1), that the terms of an ERISA plan be contained in a written instrument, require that it be a single document
 
 
 [3]
 Notwithstanding the purposes of ERISA, the Plan references fall short of satisfying the specificity requirement of the general formulation of the doctrine of incorporation by reference:
 For the terms of another document to be incorporated by reference into the document executed by the parties, the reference must be clear and unequivocal, and must be called to the attention of the other party, he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.
 17A Corpus Juris Secundum, Contracts, § 299 (emphasis added).